1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
   David W. Quinto (Bar No. 106232)
2  (davidquinto@quinnemanuel.com)
   Christopher Tayback (Bar No. 145532)
3  christayback@quinnemanuel.com
   Shahin Rezvani (Bar No. 199614)
4  (shahinrezvani@quinnemanuel.com)
   865 South Figueroa Street, 10th Floor
5  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
6  Facsimile:  (213) 443-3100

7  Attorneys for Defendant and Counterclaimant
   Turner Entertainment Company

8

9              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
10                 WESTERN DIVISION

11 BEATRICE WELLES,                          Case No. CV-08-01399 JFW (PJWx)
                                             [REDACTED]
12              Plaintiff,                   TURNER ENTERTAINMENT
                                             COMPANY'S NOTICE OF MOTION
13      v.                                   AND MOTION TO SUBSTITUTE
                                             REBUTTAL EXPERT WITNESS;
14 TURNER ENTERTAINMENT CO.,
                                             JOINT STIPULATION [Local Rule 37-
15              Defendant,                   2]; AND

16                                           DECLARATIONS OF DAVID W.
                                             QUINTO, SHAHIN REZVANI AND
17                                           STEVEN AMES BROWN
   AND RELATED COUNTERCLAIM.
18                                           DISCOVERY MATTER

19                                           Date:        August 13, 2009
                                             Time:        11:00 a.m.
20                                           Judge:       Hon. Patrick J. Walsh
                                             Courtroom: 827A
21
                                             Discovery Cut-off:    Continued per
22                                           Motion Cut-off:       Court's July 14,
                                                                   2009 Minute Order
23                                           Pre-Trial Conference: August 7, 2009
                                             Trial Date:           August 25, 2009
24

25

26
              SUBJECT TO CONCURRENTLY FILED APPLICATION TO SEAL
27

28

08770.07015/3012079.3

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE that on August 13, 2009, at 11:00 a.m., or as

3  soon thereafter as the matter may be heard, in the above-entitled Court located at

4  312 North Spring Street, Los Angeles, California 90012, Defendant and

5  Counterclaimant Turner Entertainment Company ("Turner") will, and hereby does,

6  move the Court for an order granting Turner leave to substitute rebuttal expert

7  witness David Davis in place of ████████.[1]  Turner was ordered to bring this

8  motion before the Magistrate Judge by Judge Walter in a July 14, 2009 Minute

9  Order.

10          Turner is concurrently filing an Application to Seal because the instant

11  motion contains confidential medical information of a third party, ████████,

12  that relates to a discovery matter, and is unrelated to any issue in the litigation.  As

13  addressed in Turner's Application to Seal, under Article 1 of the California

14  Constitution, Turner believes that it is obligated to seek to preserve the

15  confidentiality of ████████████████, which Turner

16  discusses in detail in its portion of the Joint Stipulation.

17          Pursuant to Local Rule 37-1 et. seq., Turner brings this motion after a

18  meet and confer conference with Steven Ames Brown (counsel for Plaintiff and

19  Counterclaim Defendant Beatrice Welles) on May 20, 2009 (with follow-up

20  conferences on May 27 and 28, 2009).  Turner also makes this motion pursuant to

21

22

23  [1]  The instant action involves just a few witnesses: plaintiff and counterclaim defendant Beatrice Welles; her business manager, Thomas White; her experts, Mark

24  Halloran and Steven Sills; Katherine Chilton, Turner's agent in executing the contracts at issue; and Turner's experts, Professor Robert Lind and ████████

25  (who Turner presently seeks to replace).  The issues in the action concern contract

26  negotiations related to issues of copyright law, and the calculation of copyright

27  royalties, and a profit participation in a motion picture.  The testimony of each expert may play a major role in both liability and damages determinations.

28

1 | Federal Rules of Civil Procedure 16(b)(4) and 26(b)(4), and Federal Rules of

2 | Evidence 702, 703, and 705.

3 | As explained in the accompanying Joint Stipulation, Turner and Welles

4 | have yet to complete expert discovery. Following the deposition of Turner's

5 | economic expert witness, ████████, and prior to the May 21, 2009 discovery cut-

6 | off date, Turner's counsel learned that ████████████████████

7 | █████████████████████████████████

8 | █████████████████████████████████

9 | █████████████████████████████████

10 | █████████████████████████████████

11 | ███████████████████. Under these circumstances, it

12 | is not reasonable for Turner to rely on ████████ to testify at trial. ████████

13 | █████████████████████████████████

14 | ████████████████████. Without a substitute expert to rebut

15 | Welles's damages expert, Turner will suffer irreparable harm at trial.

16 | Based on the Court's July 14, 2009 Minute Order (Docket Entry

17 | No. 121) continuing the discovery and motion cut-off dates for the sole purpose of

18 | having the instant Motion heard, Turner brings this Motion to Substitute Rebuttal

19 | Expert David Davis in Place of ████████.

20 | Turner bases this Motion on its portion of the attached Joint

21 | Stipulation; the Declaration of David Quinto dated June 1, 2009, and exhibits

22 | thereto; the Declaration of Shahin Rezvani dated July 15, 2009 and the exhibits

23 | thereto; the pleadings and papers on file in this action;

24 |

25 |

26 |

27 |

28 |

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

1 such matters of which the Court may properly take judicial notice; and such

2 evidence and argument that may be presented at or before the hearing on the

3 Motion.

4

5 DATED: July 17, 2009

QUINN EMANUEL URQUHART OLIVER & HEDGES. LLP

6

7 By _____

David W. Quinto

Christopher Tayback

8 Shahin Rezvani

Attorneys for Defendant and

9 Counterclaimant

Turner Entertainment Company

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

00770.07015/3012079.3

-4-

**TABLE OF CONTENTS**

**Page**

JOINT STIPULATION [LOCAL RULE 37-2] ........................................................ 1

TURNER'S INTRODUCTORY STATEMENT .......................................................... 1

WELLES'S INTRODUCTORY STATEMENT .......................................................... 2

SPECIFICATION OF ISSUE IN DISPUTE ............................................................ 4

TURNER'S CONTENTIONS, POINTS AND AUTHORITIES ................................ 4

    Brief Overview of the Case ................................................................................ 4

    The Parties' Expert Designations .................................................................... 5

    Status of Welles's and Turner's Expert Discovery .......................................... 5

    ████████████ Deposition Testimony ......................................................... 6

    Turner's Post-Deposition Investigation of ████████████ ............................ 6

    ████████ Retention of Counsel .................................................................... 8

    Turner Met and Conferred and Acted as Quickly as Possible .......................... 8

    The Court Grants Leave to File the Motion ..................................................... 10

    Turner Never Designated a "Plan B" Expert ................................................... 10

    Turner's New Expert Report ............................................................................ 11

TURNER'S ARGUMENT ....................................................................................... 12

TURNER SHOULD BE GRANTED LEAVE TO SUBSTITUTE DAVID
DAVIS IN PLACE OF ████████ FOR SEVERAL REASONS ............. 12

    A.   Substitution Is Permitted When an Expert Is Untruthful or
        Unreliable ............................................................................................ 12

    B.   ████████ Is Untruthful and Unreliable ......................................... 13

    C.   Turner and ████████ Have a Conflict of Interest .......................... 13

    D.   Granting Leave Will Not Prejudice Welles ....................................... 14

WELLES'S CONTENTIONS, POINTS AND AUTHORITIES .............................. 14

    A.   ████████████ DEPOSITION TESTIMONY WAS
        COHERENT, PROFESSIONAL AND CONSISTENT WITH
        THE EXPERT REPORT ................................................................... 14

1      B.    THE BALANCE OF DEFENDANT'S CRITICISMS OF ▉▉
2         ▉▉▉ ARE LITTLE MORE THAN CHARACTER
ASSASSINATIONS ............................................................................... 17

3      C.    DEFENDANT HAS NOT MET ITS BURDEN OF
ESTABLISHING JUST CAUSE TO SWITCH EXPERTS ............... 18

4
5      D.    DEFENDANT IGNORES THE PREJUDICE TO PLAINTIFF ......... 19

      E.    PLAINTIFF OBJECTS TO ANY CONTINUANCE OF THE
6         TRIAL DATE ...................................................................................... 21

7  TURNER'S CONCLUSION ................................................................................ 22

8  WELLES'S CONCLUSION ................................................................................. 22

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JOINT STIPULATION [LOCAL RULE 37-2]

### Turner's Introductory Statement

1    Defendant and Counterclaimant Turner Entertainment Company ("Turner") seeks leave to replace its previously-designated rebuttal economic expert, ███████████████████████████████ with David Davis of Arpeggio Partners, LLC.  Given the seriousness of the information Turner has learned concerning ██████████ and his importance to Turner's case, Turner's request should be heard on the merits.

    Turner's counsel learned following ██████████ deposition that ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ Based on Turner's conversations with ██████████ certain of his partners, and his firm's attorney, Turner believes that ██████████ would deliberately attempt to conceal any unfitness to testify at trial in the hope that by doing so he could protect the foregoing information, his professional reputation, and his firm's business interests.  This creates an inherent conflict of interest between Turner, on the one hand, and ██████████ and ██████████ on the other.

    ██████████ agrees that Turner should use a different rebuttal economic expert. ██████████ has also agreed to reimburse plaintiff's attorney for all out-of-pocket expenses incurred in connection with the ██████ deposition.

    Turner has already identified a substitute expert, David Davis of Arpeggio Partners, LLC.  On June 11, 2009, Mr. Davis provided Welles with an expert report on the same issues as ██████████ Mr. Davis has been made available for deposition on any day in August.

-1-

1
## Welles's Introductory Statement

2    Defendant's attacks on ██████ are little more than character assassinations,
3 based on inadmissible hearsay and distortions of his testimony. Defendant's true motive is
4 to withdraw intellectually honest expert testimony, and, to change theories it no longer likes.

5    Defendant engaged two damage experts, who jointly signed the existing report.
6 "The experts designated to testify in this matter are ██████████████."
7 *Brown Dec., Exhibit 1, pg. 2.* While Defendant claims it never intended to engag██
8 ████ as a testifying expert, it hasn't explained how ██████ came to believe he had
9 been retained by Turner to testify as an expert.

10    Once Defendant's showing is examined it will be clear that it refused Plaintiff's offer
11 to stipulate to the substitution of ██████████ because it is not trying to change
12 witnesses, it's trying to change answers to deposition questions it does not like, and, to
13 change theories that did not withstand deposition scrutiny, even though to do so would
14 prejudice Plaintiff.

15    Defendant in this case has an unusual discovery advantage; it has the benefit of a
16 stipulation that has permitted it a free bite at the apple. In order to facilitate a frank and
17 open exchange at the court-ordered mediation of this matter, Plaintiff agreed to accept an
18 interim expert report from Defendant, which could not be used in any manner at any
19 subsequent deposition or trial. *Brown Dec., ¶2.* That meant Defendant could request from
20 its experts an unsigned tentative report and later change any theories or conclusions it did
21 not like, without any penalties whatsoever. On April 24th Defendant produced an interim
22 report and on April 27th produced the final report, signed by ██████████
23 *Brown Dec., ¶ 2.* Defendant must have concluded the draft report was sufficient in all
24 respects because no theories or conclusions were changed. Little more than some minor
25 grammatical changes were made to the interim report's text. *Brown Dec., ¶ 2.*

26    At the core of Defendant's motion are two contentions. First, that ██████████
27 testimony was not consistent with his report. Second, that ██████ may not be a reliable
28 witnesses on August 25th because on May 12th ██████████████████

-2-

1   ███████████████████████████████████████████████ *Quinto Dec.,*

2   June 1, 2009 at ¶ 19.

3         ████████ deposition answers were fully consistent with the report that he and ██

4   ████ authored.  He was lucid, cogent and spoke authoritatively on the theories which

5   underlay the opinions and conclusions in their joint expert report. *Brown Dec.,* ¶¶ 3-4. As

6   will be seen, counsel's characterization of ████████ testimony is not accurate.

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████ *Brown Dec.,* ¶ 8. [2]

12      Once the facts are fully understood it will be clear that Defendant has not stated

13  good cause to change experts, much less to continue the trial date, which will be

14  necessitated if the motion is granted. The trial is set to start on August 25th, 11 days after

15  this motion is to be heard. Defendant will experience no prejudice is the motion is denied

16  because if ████████ does not appear at trial or if he is unable to testify, Defendant could

17  ask for a mistrial, or ████████ could be called to testify.  Plaintiff has already made that

18  offer to Defendant on several occasions.

19

20

21

22

23

24

25     [2]  A careful reading of Mr. Quinto's moving declaration shows no proof that ████

                                             Turner's

26  entire motion is based on an unrealistic apprehension that ████████ is unreliable and

   untruthful because ███████████████████████████████████████

27  ████████████████████████████████████████████████

28

**Specification of Issue in Dispute**

The Motion concerns only one issue: whether Turner should be granted leave to substitute David Davis in place of ████████████ as its rebuttal damages expert.

**Turner's Contentions, Points and Authorities**

Brief Overview of the Case

This case concerns the interpretation of two settlement agreements. The principal agreement -- the 2005 Agreement -- attempted to allocate the risk of loss between Plaintiff/Counterclaim Defendant Beatrice Welles ("Welles") and Turner based on their speculation concerning the likely outcome of an appeal of summary judgment in Turner's favor in a prior action between the parties. The 2005 Agreement provided that if Welles prevailed on her challenge to the dismissal of her claim that she owned the <u>Citizen Kane</u> motion picture copyright, Turner would negotiate a reasonable royalty for distributing the motion picture. The agreement also provided that if she prevailed on her claim that she was entitled to a 20 percent profit participation in the film, Turner would account for such profit participation.

The Ninth Circuit affirmed in part and reversed and remanded in part. In doing so, it did not overrule the trial court on grounds that would trigger either obligation. Instead, it issued a ruling not contemplated by the parties. Welles is now trying to shoehorn the Ninth Circuit's ruling into the framework of the 2005 Agreement.

Welles alleges three breaches of contract. She alleges that she prevailed on her appeal with respect to the 20 percent profit participation claim because the 9th Circuit held that there is a question of fact concerning whether Orson Welles ever negotiated an unknown contract providing for a profit participation in an unknown amount -- thereby triggering Turner's obligation under the 2005 Agreement to account for such profits. She also alleges that the Ninth Circuit's ruling on her copyright claim -- that Welles does <u>not</u> own the copyright in

1   the film but that there is a question of fact whether she can assert ownership of the
2   screenplay to demand a license for the distribution of the screenplay in home video -
3   - triggered Turner's obligation under the 2005 Agreement to negotiate a reasonable
4   royalty.  Welles further alleges that Turner has failed to account for non-home video
5   profit participation since December 31, 2007, in breach of the second agreement --
6   the 2007 Agreement.

7           Turner counterclaims for rescission of both agreements based on
8   mistake of fact.  Turner alleges that if the 2005 Agreement is judicially determined
9   to have the meaning Welles now espouses, there was never a meeting of the minds,
10  thus requiring that both agreements be rescinded.

11  The Parties' Expert Designations

12          On April 6, 2009, Welles designated two experts: Steven Sills to testify
13  concerning plaintiff's damages, and Mark Halloran to testify concerning terms of art
14  in the entertainment industry.  Declaration of David Quinto dated June 1, 2009
15  ("Quinto Decl.") ¶3.

16          Turner did not designate any expert witnesses, but on April 27, 2009, it
17  counter-designated rebuttal experts:██████████ to testify concerning damages, and
18  Professor Robert Lind to testify about the reasonableness of Turner's understanding
19  of terms in the disputed contracts.  Quinto Decl., ¶3 and Exhibit ("Exh.") A thereto.

20  Status of Welles's and Turner's Expert Discovery

21          On May 12, 2009, Turner deposed Sills.  Quinto Decl., ¶4.  On May 13,
22  2009, Welles commenced██████████ deposition. ████████████████████
23  ████████████████████████████████████
24  ███████ Id. ███████████████████████ Id. ████
25  █████████████████████████████████████
26  ██████████████████████ Id.  At that point, the parties agreed the
27  deposition could be concluded on a mutually convenient date following the May 21,
28  2009 discovery deadline.  Id.



████████ Deposition Testimony

Despite ██████████ assurances on May 13th that he was "good to go" and ready for the deposition, he did not give reliable testimony.  Quinto Decl., ¶¶6, 7, and Rough Transcript of the Deposition of ██████████ dated May 13, 2009, attached as Exh. B.  Among other things, he often gave rambling, non-responsive answers; interrupted Turner's counsel during objections and talked over Turner's counsel; failed to disclose that his report was based not only on the written materials identified therein but also on numerous oral interviews of persons highly knowledgeable concerning the calculation of profit participations in the motion picture industry; and, shortly before the lunch break, volunteered that one of Mr. Brown's questions was the first question all day he had not understood.  Id.  In addition, he made statements that Turner's counsel could not have anticipated.  Id.  For example, ██████████ abandoned one of the critical opinions offered in his report -- that a "reasonable royalty" to pay plaintiff would be 8.5 percent.  Id.

Turner's Post-Deposition Investigation of ██████████

On May 14, 2009, Turner's counsel contacted ██████████ to discuss the deposition and to seek an explanation for his behavior.  Quinto Decl., ¶¶8-12.  ██████████████████████████████ Id.  ██████████████ ██████████████████████████████████████ Id.  On May 15, 2009, after visiting ██████████████████ allowed Turner's counsel to speak with him.  Id. ¶¶13, 14.  ████████████████████████████████████ ████████████████████████████████ Id.  ████████ ████████████████████████████████████████████ ██████████████████████████████████████ Id. ¶14.  ██████████████████████████████████ ████████████████████████████████████████ Id. ¶15.



1    Thereafter, Turner's counsel called

2    Quinto Decl., ¶¶16, 17.

3

4

5    Id.

6

7    Id.

8

9    Quinto

10   Decl., ¶18.

11

12   Id.

13   Id.

14

15

16

17   . Quinto

18   Decl., ¶¶13, 19.

19

20   Quinto Decl., ¶¶19, 20.

21   Id.

22   Id.

23   Id., ¶18.

24

25

26

27

28   Id.



1       At that point, ███████ stated that he had just been told by his

2 partners that they were concerned that he was "going" to say too much and should

3 consult with his attorney before saying "anything else." Quinto Decl., ¶21. Turner

4 therefore terminated the conversation. <u>Id</u>.

5       Turner's counsel then contacted ████████████████████████

6 ████████████████████████████████████████████████████

7 ██████ Quinto Decl., ¶22. ████████████████ <u>Id</u>. ████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████ <u>Id</u>. ██████████████████████ <u>Id</u>.

10 ████ <u>Retention of Counsel</u>

11       On May 18, 2009, ████████ a partner in the ████████ law

12 firm in ████████ contacted Turner. Quinto Decl., ¶23. ████████

13 identified himself as an attorney for ████████ company, ████████ and said that

14 he wished to discuss ████████ <u>Id</u>. After a brief discussion, Turner informed

15 ████████████████ that it wished to find a new economic expert. Quinto

16 Decl., ¶¶24-27.

17       On May 20, 2009, ████████ agreed that ████████ would reimburse

18 Welles for all out-of-pocket expenses incurred in connection with ████████

19 deposition. Quinto Decl., ¶27. Turner's counsel explained that Turner would pay

20 ████████ only to the extent that its new expert, whomever he or she might be,

21 could use the background analytical work previously performed by ████████

22 ████████ associate at ████████ <u>Id</u>.

23 <u>Turner Met and Conferred and Acted as Quickly as Possible</u>

24       After speaking with ████████ on May 20th, Turner's counsel

25 immediately met and conferred with Welles's counsel, Mr. Brown, and, in doing so,

26 disclosed the facts set forth above. Quinto Decl., ¶28. Turner informed Mr. Brown

27 that it needed to replace ████████████████████████████████

28 ████████████████████████████████████████████████

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

1  � ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

2  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Id.

3  Mr. Brown explained to Turner's counsel that for various reasons

4  (including that Turner did not yet have a proposed replacement and Mr. Brown did

5  not know whether any new expert would simply adopt the ▉▉▉▉▉ report) Welles

6  could not stipulate, and might never stipulate, that Turner could rely upon a different

7  rebuttal damages expert. Quinto Decl., ¶29. Mr. Brown asked, however, that

8  Turner take no action involving him until after the Memorial Day weekend because

9  he was committed to attending a family reunion in Florida. Id. Turner's counsel

10  explained that a factor that a court may consider in ruling on a request to designate a

11  new expert is delay in seeking relief. Id. Mr. Brown agreed that Welles would not

12  assert that Turner had delayed in seeking relief. Id.

13  On May 27, 2009, Turner made a further effort to resolve the dispute

14  with Welles. Quinto Decl., ¶30. Turner advised Welles that it had selected a

15  substitute expert, Mr. Davis. Id.

16  On June 1, 2009, Turner made its first application to this Court seeking

17  relief. Declaration of Shahin Rezvani dated July 16, 2009 ("7/16/09 Rezvani

18  Decl.") ¶ 6.

19  On June 5, 2009, Turner's counsel was informed by the Court's clerk

20  that its ex parte application had been denied. 7/16/09 Rezvani Decl., ¶7.

21  Believing that its unopposed ex parte application to shorten time had

22  been denied because Turner had not also sought leave to re-open discovery, on June

23  8, 2009, Turner brought a noticed Motion to Reset the Discovery Cut-Off Date,

24  Substitute Rebuttal Expert Witness David Davis in Place of Weston Anson, and File

25  under Seal All Papers Related thereto. 7/16/09 Rezvani Decl., ¶8.

26  On June 9, 2009, the Court issued a Minute Order denying Turner's

27  motion, without prejudice, on the basis that Turner should have sought *only* leave to

28  re-open discovery. 7/16/09 Rezvani Decl., ¶9. The Court explained that if the

1   Court granted such motion, Turner could then seek leave from the Magistrate Judge

2   to substitute rebuttal expert witness David Davis in place of ███████████  Id.

3          On June 15, 2009, Turner filed a separate motion to reset the discovery

4   and motion cut-off dates to allow the instant motion to be heard. 7/16/09 Rezvani

5   Decl., ¶10.

6          By Minute Order dated June 18, 2009, the Court ordered Turner to

7   retrieve its papers for failure to comply with the Local Rules with respect to the

8   sealing of documents. 7/16/09 Rezvani Decl., ¶11.

9          Turner corrected the discrepancy in its papers and re-filed its motion to

10  substitute on June 25, 2009. 7/16/09 Rezvani Decl., ¶12.

11  The Court Grants Leave to File the Motion

12         By Minute Order dated July 14, 2009, the Court ruled on Turner's June

13  25, 2009 motion. Judge Walter granted in part a motion by Turner to reset the

14  discovery and motion cut-off dates to allow Turner to make the instant motion to

15  substitute. 7/15/09 Rezvani Decl. Exh. B. Judge Walter further ordered that Turner

16  file the instant motion to be heard by Magistrate Judge Walsh. Id.

17  Turner Never Designated a "Plan B" Expert

18         Welles has expressed the view that Turner should be required to use

19  ███████ assistant, ███████ to testify in place of ███████ Quinto Decl.,

20  ¶31. She argues that ███████ co-signed the report, which recited that either

21  ███████████ might testify, and that Turner is now somehow bound by

22  that sentence. Id.

23         However, Turner's rebuttal expert designation did not, to quote Jerry

24  Seinfeld, contain a "Plan B." Specifically, Turner's designation did *not* identify

25  ███████ as a possible testifying expert. Id. Neither Mr. Quinto nor Christopher

26  Tayback, the partners representing Turner, had seen the report before it was

27  provided to Mr. Brown on April 27, 2009. (Mr. Quinto had merely discussed the

28  opinions expressed in the report by telephone). Id. The draft report was not

1   available for review until the afternoon it had to be served.  Id.  At that time,

2   Mr. Quinto was en route to Sedona, Arizona because he had agreed to Mr. Brown's

3   request that, as a courtesy, he conduct plaintiff's deposition there.  Id.  Also at that

4   time, Mr. Tayback, was conducting a deposition in the mid-west.  Id.

5           Turner does not want to be required to use ▆▆▆▆ or another expert

6   witness from ▆▆▆▆ under the circumstances.  Quinto Decl., ¶¶31, 32.  Turner's

7   "Disclosure of Rebuttal Experts" designated only two expert witnesses: Professor

8   Lind and ▆▆▆▆.  Id.  Turner did _not_ designate ▆▆▆▆  Id.  ▆▆▆▆ has

9   *never* testified as an expert at trial and has given only *one* expert deposition.  Id.

10  Turner understandably does not wish to be forced to rely on an expert witness who

11  has no trial experience, whom it never designated.  Id.

12          ▆▆▆▆ *agreed* that Turner should retain a different expert and

13  *agreed* to reimburse plaintiff's counsel for all out-of-pocket expenses incurred in

14  connection with the ▆▆▆ deposition.

15  Turner's New Expert Report

16          On May 28, 2009, Turner contacted Mr. Brown again.  Quinto Decl.,

17  ¶33.  Turner informed Mr. Brown that Mr. Davis would provide an expert report on

18  the same issues as ▆▆▆▆, reaching similar conclusions as ▆▆▆▆ although

19  using a different methodology.  Id., and e-mail message from David Quinto to

20  Steven Ames Brown dated May 28, 2009, and e-mail message from Steven Ames

21  Brown to David Quinto dated May 28, 2009, attached as Exhs. C and D,

22  respectively, to the Quinto Decl.

23          On June 11, 2009, Turner in fact provided Welles with Mr. Davis's

24  rebuttal expert report.  7/15/09 Rezvani Decl., ¶ 2 and Exh. A.  Mr. Davis has been

25  made available for deposition on any day in July and any day in August.

26

27

28

Turner's Argument

## TURNER SHOULD BE GRANTED LEAVE TO SUBSTITUTE DAVID DAVIS IN PLACE OF MR. ANSON FOR SEVERAL REASONS

### A. Substitution Is Permitted When an Expert Is Untruthful or Unreliable

Courts routinely grant leave to substitute expert witnesses when experts are misleading or untruthful, or fail to testify competently, or disclose a conflict of interest. For example, in <u>Suter v. National Rehab Partners Inc.</u>, 2006 WL 3531647 at *1, *2 (D. Idaho Dec. 6, 2006), the court granted the plaintiff leave to substitute a new expert after the plaintiff learned at the expert's deposition that the expert lacked a Masters Degree notwithstanding that his resume suggested otherwise.

In <u>National Railroad Passenger Corp. v. Expresstrak LLC</u>, 2006 WL 2711533 at *1, *4 (D.D.C. Sept. 21, 2006), the court permitted the plaintiff to designate a new expert following the discovery cut-off because the expert had inaccurately represented his personal, professional, and educational background:

> Here, if the Court denies the plaintiff the opportunity to substitute its expert witness, the plaintiff would potentially sustain a substantial prejudice.  As noted above, since [the plaintiff's expert witness] Wlotko's credibility has been seriously damaged as a result of the plaintiff's discovery that he provided inaccurate information as to his professional, educational, and personal background, it is likely that the plaintiff's ability to establish the true value of its liquidated damages claim at trial will be significantly impaired if it has to rely on Wlotko's testimony.

<u>Id.</u>

Courts also permit substitution when an expert has failed to testify competently.  For example, in <u>Graffenried v. United States</u>, 20 Cl. Ct. 458, 484 n.16 (1990), the court allowed substitution after the defendant's initial expert became emotionally distressed on the stand, began behaving erratically, and was physically unable to complete cross-examination.  In <u>Gucci America, Inc. v. Exclusive Imports International</u>, 2001 WL 246387 at *1 (S.D.N.Y. Mar. 13, 2001), the court granted leave to substitute an expert after the original expert failed to testify competently

1  and made several damaging errors during his deposition, including identifying an

2  authentic Gucci watch as a counterfeit.

3  **B.**      ██████████ **Is Untruthful and Unreliable**

4       Turner wishes to replace ██████ because ██████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ████████████████████████████ For these reasons, ██████████

10  cannot be relied on to testify competently at trial or to be honest concerning his

11  fitness to testify.

12  **C.**   **Turner and** ██████████ **Have a Conflict of Interest**

13       Courts further allow substitution when there is a conflict of interest for

14  a party to continue to retain and to use at trial the party's original expert witness.

15  For example, in Habtu v. Woldemichael, 694 A.2d 846, 849-50 (D.C. Cir. 1997), the

16  court held that the trial court erred in refusing to grant the plaintiff an opportunity to

17  name a new expert where there was a conflict of interest because the original expert

18  knew the defendant, and there remained 3 months before trial.

19       ██████████ is unreliable as an expert witness in light of Turner's

20  investigation and the involvement of ██████████████████ In

21  consideration of these circumstances, an inherent conflict of interest exists if Turner

22  continues to retain and use ██████████████ as a testifying expert at trial.

23       Under these circumstances, courts routinely grant leave to substitute

24  expert witnesses. In the cases cited above, untruthfulness, unreliability, or a conflict

25  of interest were each sufficient to permit substitution. Here, *all three circumstances*

26  *exist.*

27

28

00770.07015/3012079.3

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

**D.** **Granting Leave Will Not Prejudice Welles**

Granting leave to substitute will not prejudice Welles. On June 11, 2009, Turner's substitute expert, Mr. Davis, provided Welles with an expert report on the same issues as █████████'s report, reaching conclusions similar to Mr. Anson's. 7/15/09 Rezvani Decl. Exh. A. Because, the Court has already reset the discovery and motion cut-off dates, Welles cannot argue prejudice with respect to delay. Finally, █████████ has agreed to pay Welles's out-of-pocket expenses incurred in connection with █████████'s deposition. Quinto Decl., ¶27.

<u>**Welles's Contentions, Points and Authorities**</u>

**A.** █████████**'S DEPOSITION TESTIMONY WAS COHERENT, PROFESSIONAL AND CONSISTENT WITH THE EXPERT REPORT.**

The entirety of Defendant's evidence concerning of █████████'s testimony is contained in paragraph 7 of Mr. Quinto's June 1, 2009 declaration. The bulk of the attacks are piffling. One of the attacks is factually wrong and one raises more questions about Defendant's conduct than that of █████████

Mr. Quinto claims that "█████████ abandoned one of the critical opinions offered in his report -- that a 'reasonable royalty' to plaintiff would be 8.5%." *Quinto Dec.* June 1, 2009 at 4:18-20.

█████████'s report said <u>no</u> such thing:

"It is our opinion that, if a copyright royalty were to be negotiated (in addition to profit participation), a reasonable copyright owner would likely accept a royalty rate of 10% of the net sales of the home-video release of *Citizen Kane.*" *Brown Dec., Exhibit* 1, pg. 6.

The █████████ report reasoned that the industry standard was "the traditional 20% of the net sales of the home-video release" (*Brown Dec., Ex 1.,* pg 6), but that because of "the variety of creative talent involved in a motion picture, writers, directors,

1  producers, actors, composers, and musicians, we concluded that a 50% apportionment of
2  the screenplay alone is a maximum allocation." (*Brown Dec., Ex 1*, pg. 7).  ████████
3  never abandoned that theory. The most ground he gave was to concede that if the reasons
4  for the apportionment disappeared, so would the justification for the apportionment, *i.e.*, if
5  the plaintiff stood in the shoes of a company that delivered 100% of the creative elements
6  in the film, that plaintiff would expect "the traditional 20%" royalty without any
7  apportionment. *Quinto Dec. Ex. B*, 86:10-19.   There was no other intellectually honest
8  answer for Mr. Anson to give. Turner simply wants to get rid of that testimony, and,
9  apparently expects not to bear any of the costs Plaintiff incurs. [3]

10       What's troubling Defendant was ████████'s insistence on being intellectually
11  honest. For instance, Defendant claims that in ████████'s deposition he "failed to disclose
12  that his report was based not only on the written materials identified therein but also on
13  numerous oral interviews of persons highly knowledgeable concerning the calculation of
14  profit participations in the motion picture industry". *Quinto Dec.* June 1, 2009 at 4:13-16.
15  However, F.R.Cv.P. 26(a)(2)(B)(i) requires that all bases for opinions be disclosed in the
16  expert report. ████████ could not have testified that his conclusions were derived from
17  any basis not disclosed in the ████████ report.

18       However, that raises a more troubling issue. F.R.Cv.P. 26(a)(2)(B)(ii) requires that
19  all information considered by an expert be disclosed in the report. Defendant's three
20  attorneys had a draft of the expert report three days before it was finalized, yet they
21  apparently said nothing to ████████ about his failure to disclose the purported oral
22  interviews. If counsel expected ████████ to rely on any oral interviews, they bore the
23  responsibility of telling ████████ to disclose them in his final report. Indeed, counsel
24  should at the very least have instructed ████████ to list the oral interviews as "information
25  considered" by the witness under subsection (ii) of the rule.

26  ─────────────
27  [3] Turner's strategy couldn't be more transparent; to replace its expert to testify as to
the same theories, but after reading ████████'s existing deposition, conclude that even if
28  the underlying assumptions are incorrect, the royalty must still be apportioned and reduced.

1    In any event, ████████ had no reason to rely on any oral interviews to justify his

2    "profit participation" theories because there was a well-respected text which stood for

3    precisely the point he wanted to make, which Plaintiff's expert, Mr. Sills, would not attack.

4    ████████ specifically cited Mr. Sills' own book as authority. *Quinto Dec.,* June 1, 2009,

5    *Ex. B.,* pg 70:24-71:4.

6    Defendant also criticized ████████ for conceding that only one of the deposition

7    questions was not understood by him. *Quinto Dec.,* June 1, 2009 at 7:16-17. Unlike the

8    depositions taken by Turner in this case, Plaintiff's depositions were taken with prepared

9    questions. *Brown Dec.,* ¶ 6. Preparing questions in advance allows the writer to

10   extensively edit them, which minimizes the likelihood that they won't be understood. After

11   being confronted with questions he could neither evade nor parse, ████████ did little more

12   than point out that the examiner had finally faltered and asked a question that he did not

13   understand. Defendant's criticism is that ████████ precluded himself from changing his

14   testimony at trial by acknowledging during his deposition that he understood the questions.

15   ████████ cannot be criticized for failing to preserve an opportunity to mislead and no

16   expert should be expected to preserve such an opportunity. The purpose of expert

17   testimony is to aid the trier of fact, not fence with opposing counsel.

18   Finally, Defendant is attempting to outright switch theories under the guise of this

19   motion. Defendant has represented to the Court that Mr. Davis had reached "similar

20   conclusions as ████████." That is incorrect. ████████ testified that Ms. Welles'

21   copyright royalty was properly computed on a base consisting of 100% of the distributor's

22   wholesale receipts. He directly stated that his use of that formula in the ████████

23   report was correct. *Quinto Dec.,* June 1, 2009, *Ex. B.* pg 79:11-15. However, Mr. Davis'

24   proposed report directly states that the royalty should be computed on a base consisting of

25   20% of the distributor's wholesale receipts. *Supp. Quinto Dec.,* June 15, 2009, *Ex A,* pg.

26   13. Given that Mr. Davis would reduce the base of Ms. Welles' copyright royalty by 80

27   percentage points, it is disingenuous at best to say that their conclusions are "similar."

28   Defendant is not only seeking to escape ████████'s truthful testimony, it's trying to escape



the ████████ report, the draft of which it <u>approved</u> before the final report was signed by ████████

## B. THE BALANCE OF DEFENDANT'S CRITICISMS OF ████████ ARE LITTLE MORE THAN CHARACTER ASSASSINATIONS.

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

00770.07015/3012079.3

1   This motion is really not about substituting out ▮▮▮▮▮▮; it's about prejudicially

2   substituting in new theories.  What is particularly oppressive about this motion is that

3   because it is both under seal and because Plaintiff's representatives are prohibited by the

4   Rules of Professional Conduct from contacting ▮▮▮▮▮▮▮▮▮, there is no way to

5   bring before the Court what is undoubtedly another side of the story.

### C. DEFENDANT HAS NOT MET ITS BURDEN OF ESTABLISHING JUST CAUSE TO SWITCH EXPERTS.

8   Defendant does not challenge that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮, or that he agreed to resume his deposition at a mutually agreeable

10  date. Defendant has incorrectly charged that ▮▮▮▮▮'s testimony was inaccurate on the

11  issue of damages, whereas in fact ▮▮▮▮▮ testified consistently with his report, and only

12  gave ground where the failure to do so would have required a dishonest response.

13  There's literally no substance to this motion other than Counsel's discomfort with a

14  witness being reluctant to discuss an intensely private matter.  There is no basis for

15  concluding that ▮▮▮▮▮ will not be fit to testify on August 25th.  Defendant's argument is

16  nothing more than speculation premised on the most tenuous of facts.  To put this matter

17  into perspective, had ▮▮▮▮▮ been Turner's employee and had it sought to unilaterally

18  terminate him for allegedly over-using a controlled (but lawfully obtained) medicine, Turner

19  would have violated the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* [4]

20  There is a clear public policy against the sort of peremptory termination that Turner is

21  seeking.  Turner is doing nothing more than asking the Court to endorse invidious

22  discrimination that would be unlawful for an employer.

23  The anxiety Turner is claiming has nothing to do with ▮▮▮▮▮▮▮ but it has

24  everything to do with Turner's discomfort with the very damage theories it approved, after

25  having been afforded by Plaintiff an absolute right to discard them, which Defendant chose

26

27  [4]   Only "the illegal use of drugs" is excluded from the ADA.  42 U.S.C. § 12114. Over-use of prescribed medications is a covered disability.

28

-18-

1   to retain and now seeks to discard.

2       If Defendant's unfounded predictions of ███████ 's future malfeasance are to be

3   accepted (and based on this record they should not), then Defendant must be held to

4   reimburse Plaintiff for all costs she incurs by virtue of any expert re-designation, and, she

5   should not be expected to pursue ███████████████████ ' company) for such

6   reimbursement.  If Defendant has an indemnity claim against Consor, that is between

7   Defendant and ███████  It is the Defendant who is here asking for permission to do

8   something which will prejudice and cost Plaintiff money, and it is Defendant who should

9   make her whole.

10          D.      **DEFENDANT IGNORES THE PREJUDICE TO PLAINTIFF**

11      Plaintiff has two experts, one for damages and the other for motion picture industry

12  custom and practice.  Defendant proposes to change its theories which will necessitate

13  Plaintiff expending substantial funds to compensate her two experts.  At the very least it

14  can be expected that the experts, whose billing rates are $465.00 and $500.00 per hour,

15  will each expend at least five hours studying any new report and preparing testimony

16  thereon.  The additional expert witness expense Plaintiff will likely incur is $4,825.00

17  ($2,325.00 and $2,500.00 respectively).  *Brown Dec.,* ¶ 5.

18      Plaintiff's counsel will also likely have to expend at least five hours studying any new

19  report and no less than eight hours preparing to take a new deposition. [5]  That will likely

20  cause another $6,500.00 in loses for Plaintiff.  *Brown Dec.,* ¶ 6.

21      By virtue of Defendant having ordered a rough transcript of ███████ 's deposition,

22  the transcription order could not be cancelled, thereby increasing Plaintiff's expenses by

23  $811.35, the court reporter's charges for ███████ 's deposition.  *Brown Dec.,* ¶ 7.

24      Defendant has not offered to pay a single penny of these expenses.  Rather,

25  Defendant's memorandum merely repeated a hearsay statement allegedly made by an

26  _____

27  [5] The writer does not take depositions from outlines; he prepares the entire
    examination, question by question, in advance.

28

1   attorney in ████████████ making some sort of "out-of-pocket" reimbursement.

2   *Memorandum* at 7:18-20 and 12:3-4.  That is neither enforceable nor an offer from

3   Defendant to reimburse Plaintiff for the costs she will incur, should Defendant be permitted

4   to change its theories and substitute experts.  When a party seeks to substitute an expert,

5   that party is responsible for reimbursing the other side for all costs thereby incurred.  *Gucci*

6   *America, Inc. v. Exclusive Imports International,* 2001 WL 246387 (SDNY 3/13/2001).  The

7   party seeking to re-designate its expert bears the risk of loss: that is Defendant and not

8   Plaintiff.

9       The least amount of prejudice to Plaintiff would be to deny Turner's motion.  Short of

10  that, the least amount of prejudice would be a substitution of ████████████

11  ████ co-authored and signed the report. ████████ personally attended the deposition of

12  Plaintiff's damage expert.  Defendant has articulated no reason why ████████ would be

13  unsuitable.  Indeed, the very fact that ████████ co-signed a report that directly stated that

14  both he and ████████ had been designated to testify strongly suggests that Defendant

15  had led him to believe that fact was true. [6]

16      In any event, substituting ████████ for ████████ would be less prejudicial to

17  Defendant than utilizing Mr. Davis.  Turner's counsel were parties to a meeting which

18  included ████████ in person and ████████ by telephone.  The statements made by

19  Turner's counsel concerning this litigation are admissible against Turner.  *United States v.*

20  *Gregory,* 871 F. 2d 1239, 1242-1243 (4th Cir. 1989).  (Statements made by trial counsel to

21  a third party are admissible over a hearsay objection.)  Turner's counsel made statements

22  at that meeting that are relevant to disputed issues in this case and ████████████

23  will testify under subpoena if Defendant does not call one of them as an expert.  Thus, if

24  Turner substitutes Mr. Davis as its expert, the number of witnesses in this case will

25

26  ───────────
    [6] While Plaintiff does not doubt Counsel's representation that because he was on the
    road he was unaware that the ████████ report recited that both had been retained to

27  testify, there was no explanation as to how ████████ could have come to believe that he
    had been engaged by Turner to testify if that was not the case.

28

1 unnecessarily grow. [7]

2     If Turner's motion is denied, there are no costs to Plaintiff which would require

3 shifting and no trial continuance, which would be highly prejudicial to Plaintiff as discussed

4 below. If ████████ is substituted in for ████████, Plaintiff's claimed expenses would be

5 $7,311.35 (the cost of ████████'s transcript plus the cost of preparing for ████████'

6 examination). If instead Mr. Davis is substituted in for ████████, Plaintiff's claimed

7 expenses are $12,136.35 (the same costs as above, plus the expert costs associated with

8 reviewing and preparing to testify at trial on any new report.)

9             **E.  PLAINTIFF OBJECTS TO ANY CONTINUANCE OF THE TRIAL DATE.**

10     Above Defendant argues that Plaintiff will not be prejudiced if the motion is granted

11 because (1) expert discovery is not yet complete, and, (2) Plaintiff has been offered the

12 opportunity to depose Mr. Davis before this motion is to be heard. Defendant is wrong on

13 both counts. Judge Walter's July 14, 2009 *Order* quite explicitly denied Defendant's motion

14 to take any further expert discovery in this action. Discovery was reopened solely for the

15 purpose of this motion. If the instant motion is granted, there would obviously have to be a

16 continuance of the trial, but Judge Walter has made clear there will be no depositions of the

17 existing experts because they were not taken before the cutoff.

18     To grant this motion will obviously involve a trial continuance because the new

19 expert would have to be deposed. While it may seem like that cures the prejudice to

20 Plaintiff (assuming her expenses are reimbursed), it does not. While Turner reasons it

21 would be prejudiced if this motion is not granted, the other side of the equation, the one

22 which Turner avoids discussing, is the prejudice to Plaintiff if the trial is delayed.  Mr.

23 Quinto has twice deposed Beatrice Welles. The first time was when he defended *Welles v.*

24 *Academy of Motion Picture Arts and Sciences*, USDC CD CA 03-5314 DDP. When Mr.

25 Quinto pressed Ms. Welles about her personal finances she became visibly distraught and

26

27     [7]  In such event, neither ████████████ would be under Defendant's

28 employ, but instead would be (potentially disgruntled) former experts.

1   began to sob.   The deposition had to be adjourned while Ms. Welles regained her

2   composure. *Brown Dec.,* ¶ 9.  In this action Ms. Welles gave her testimony from a zero-

3   gravity recliner because of back pain.  She told Mr. Quinto that she was unable to sit

4   upright for more than a few minutes, is almost entirely unable to work, is now unmarried,

5   and is of limited means. *Brown Dec.,* ¶ 9. To delay the trial puts Plaintiff at risk financially

6   because it effectively starves Plaintiff out of her day in court. [8]

7         Finally, Defendant argues that it has a "conflict" with ▮▮▮▮.  That is nonsense.

8   There is no conflict between them. Defendant tries to make something of ▮▮▮▮ having

9   his company lawyer speak with defense counsel, even though he only did so because

10  Defendant 's counsel insisted on asking ▮▮▮▮ about his private life.  Engaging a

11  lawyer does not create a conflict. Given Defendant's overbearing and invasive questioning,

12  engaging a lawyer was an entirely sensible and understandable response.  However, it

13  does *not* create "conflict" that justifies causing the trial to be continued.

14        If there is any prejudice to be borne, it should be shouldered by Defendant.  To delay

15  Plaintiff's justice is to deny her justice.

16

17                       **Turner's Conclusion**

18        For all the foregoing reasons, Turner respectfully requests that the

19  Court grant Turner leave to substitute expert witness David Davis in place of

20  ▮▮▮▮▮▮

21                       **Welles's Conclusion**

22        There really cannot be any question that if Plaintiff had brought this motion, Turner

23  would have accused her of histrionics. That Turner's plea is nearly theatrical is made clear

24  by the fact that it has done virtually nothing to determine whether ▮▮▮▮ has been

25  _____
       [8]  Plaintiff necessarily demonstrates her limited means by the writer's testimony.

26  Had it been made by the Plaintiff's declaration, it would have accomplished nothing more
    than to arm Defendant with an embarrassing first-person admission that could be used to

27  humiliate her at trial.

28

1 | professionally evaluated, or whether there is any legitimate reason to have any future

2 | concerns. Turner is expecting Plaintiff to endure significant disruption during the time when

3 | she should be preparing her pretrial materials and her trial book in order to meet the

4 | Court's deadlines.

5 | Turner's motion should be denied.  ▉▉▉▉  should remain Turner's expert, or at

6 | most Turner should be granted leave to substitute ▉▉▉  If there is any substitution,

7 | Plaintiff should be reimbursed her costs as against Turner.  She should not be forced to

8 | pursue ▉▉▉▉

9

10

11 | DATED: July ⁄⁄, 2009

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

12

13 | By

14 | David W. Quinto
Christopher Tayback
Shahin Rezvani
Attorneys for Defendant and
Counterclaimant
Turner Entertainment Company

15

16

17 | DATED: July _16, 2009

LAW OFFICES OF STEVEN AMES BROWN

18

19 | By

20 | Steven Ames Brown
Attorneys for Plaintiff and Counterclaim
Defendant Beatrice Welles

21

22

23

24

25

26

27

28

0701530012079.2

-23-

# QUINTO DECLARATION

## DECLARATION OF DAVID W. QUINTO

I, David W. Quinto, declare as follows:

1.      I am a member of the Bar of the State of California and am a partner in Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for defendant Turner Entertainment Co. ("Turner") herein. I make this declaration of my personal and firsthand knowledge and, if called and sworn as a witness, I could and would testify competently hereto.

### Summary of Turner's Request

2.



Pg. 24

DECLARATION OF DAVID W. QUINTO ISO TURNER'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME AND MOTION FOR LEAVE

1

2

3   ### The Parties' Expert Designations

4       3.      On April 6, 2009, Plaintiff Beatrice Welles designated two experts:

5   Steven D. Sills, to testify concerning plaintiff's claimed damages, and Mark

6   Halloran, to testify concerning alleged terms of art in the entertainment industry.

7   Turner did not designate any experts, but it did counter-designate rebuttal experts.

8   Specifically, it counter-designated ███████, the founder and chairman of

9   ███████, as its rebuttal economic expert, and further counter-designated Professor

10  Robert Lind to testify concerning the reasonableness of Turner's understanding that

11  various terms have a legal meaning different from their alleged industry usage.  A

12  true and correct copy of Turner's counter-designation of its rebuttal experts (without

13  exhibits) is attached as Exhibit A.

14  ### Status of Expert Discovery

15      4.      On May 12, 2009, Mr. Sills was deposed in this matter by my partner,

16  Christopher Tayback.  On May 13, 2009, ███████ appeared for his deposition,

17  which I defended.  ████████████████████████

18  ████████████████████████████████████

19  Following the lunch break, ███████ advised plaintiff's attorney, Steven Ames

20  Brown, ████████████████████████  At that point, the parties

21  agreed that the deposition would be concluded on a mutually convenient date

22  following the May 21, 2009 discovery cut-off date.

23      5.      Plaintiff's second expert, Mr. Halloran, was required to appear for

24  deposition on May 18, 2009.  However, on Sunday, May 17, Mr. Brown reported

25  that Mr. Halloran was "exhausted" and would not appear for deposition the

26  following day.  Mr. Brown offered to make Mr. Halloran available for deposition in

27  June.  Mr. Halloran's deposition has not yet been re-scheduled.  Because

28  Mr. Halloran's deposition has been postponed to a date uncertain at plaintiff's

1   request, Professor Lind's deposition as a rebuttal expert has also been postponed

2   indefinitely.

3   ███████'s Deposition Testimony

4   6.   As stated, I defended ███████'s deposition. Because he had

5   appeared to be very ill when Mr. Tayback, my associate, Shahin Rezvani and I met

6   with him the day before, I asked ███████ before the deposition began whether he

7   was able to give his best testimony. He assured me that he was "good to go."

8   Mr. Rezvani later advised me that following his preparation meeting the day before,

9   Mr. Anson also confirmed that he was "good to go."

10   7.   As the deposition proceeded, I became increasingly concerned that

11   ███████ was not giving his best testimony. Among other things, he often gave

12   rambling, non-responsive answers; interrupted me while I was stating objections and

13   attempted to talk over me; failed to disclose that his report was based not only on the

14   written materials identified therein but also on numerous oral interviews of persons

15   highly knowledgeable concerning the calculation of profit participations in the

16   motion picture industry; and, shortly before the lunch break, volunteered that one of

17   Mr. Brown's questions was the first question all day he had not understood. In

18   addition, he made statements that I could not have anticipated. For example,

19   ███████ abandoned one of the critical opinions offered in his report -- that a

20   "reasonable royalty" to pay plaintiff would be 8.5%. A true and correct copy of the

21   rough transcript of ███████'s deposition testimony is attached as Exhibit B. I

22   have reviewed that transcript. It truly and accurately sets forth the questions

23   Mr. Brown posed and the responses ███████ gave during his deposition, as well

24   as the objections I made.

25   Post-Deposition Investigation of ███████

26   8.   ████████████████████████████████

27   

28   ████████████████████████████████████████████

X770.0701S/2949301.5



Pg. 27

X0770.0701S/2949301.5

DECLARATION OF DAVID W. QUINTO ISO TURNER'S EX PARTE APPLICATION FOR ORDER
SHORTENING TIME AND MOTION FOR LEAVE



Pg. 28

X0770.070 15/2949301.5

DECLARATION OF DAVID W. QUINTO ISO TURNER'S EX PARTE APPLICATION FOR ORDER
SHORTENING TIME AND MOTION FOR LEAVE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



X0770.07015/2949301.5

Pg. 29



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

X0770.070 15/2949301.5

DECLARATION OF DAVID W. QUINTO ISO TURNER'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME AND MOTION FOR LEAVE

1   <u>Communications with</u> ████ <u>'s Attorney</u>





### Disclosure to Plaintiff's Counsel

28.    I immediately called plaintiff's counsel, Mr. Brown. I disclosed to Mr. Brown all information set forth above. I then told Mr. Brown that Turner had concluded that it needed to replace ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I invited Mr. Brown to ask me any question about the subject and promised that I would withhold no information in my response.

29.    Mr. Brown explained that for various reasons (including that Turner did not yet have a proposed replacement and Mr. Brown did not know whether any new expert would simply adopt the ▮▮▮▮▮▮ report) defendant could not stipulate, and might never stipulate, that Turner could rely upon a different rebuttal damages expert. Mr. Brown asked, however, that Turner take no action involving him until after the Memorial Day weekend because he was committed to attending a family reunion in Florida. I explained that a factor that a court may consider in ruling on a request to designate a new expert is delay in seeking relief. Mr. Brown agreed that plaintiff would not assert that Turner had delayed in seeking relief.

Pg. 32

10770.0701S/2949301.S

<u>Meet and Confer regarding the Motion</u>

1

2    30.   I next spoke with Mr. Brown following Memorial Day, on May 27. I

3  advised him that Turner had selected a new expert, David Davis of Arpeggio

4  Partners, LLC. We conducted a meet-and-confer conversation. At the conclusion,

5  Mr. Brown advised me that he considered the meet-and-confer process to be

6  ongoing and expressed his client's position that the meet-and-confer process could

7  not be concluded until Mr. Brown had reviewed Mr. Davis' report.

8    31.   During our meet-and-confer conference, Mr. Brown expressed the view

9  that Turner should be required to call ██████████████████████, to

10  testify in ████████'s stead. Mr. Brown argued that because ████████'s report was

11  also signed by ████████, and because the report contained the *ipse dixit* assertion

12  by ████████ that *either* █████████████████ might testify, Turner is somehow

13  bound by that. In fact, Turner's designation of rebuttal expert witnesses did *not*

14  identify ████████ as a possible testifying expert and neither my partner,

15  Mr. Tayback, nor I had seen the report before it was provided to Mr. Brown on

16  April 27, 2009. My associate, Mr. Rezvani, and I did have several conversations

17  with ████████ employees before then during which we discussed the facts, findings

18  and opinions that would be expressed in the report. However, the draft of the report

19  was not available for review until the afternoon it had to be served. At that time, I

20  was en route to Sedona, Arizona because I had agreed to Mr. Brown's request that,

21  as a courtesy, I conduct plaintiff's deposition there. Also at that time, my partner,

22  Chris Tayback, was conducting a deposition in the mid-west.

23    32.   I have discussed with ████████ his experience as a testifying expert.

24  He has advised me that during the 1990's, he was called upon to testify at trial as a

25  percipient witness; he once gave a deposition as an expert witness; and he has never

26  testified at trial as an expert witness. Turner understandably does not wish to be

27  forced to rely on an expert witness it never designated and who, in fact, has never

28  provided expert trial testimony.       Pg. 33

33.   On May 28, I advised Mr. Brown by e-mail message that Turner would provide Mr. Davis' report by June 10 or 11, and that apart from June 30 through the July 4 weekend, Mr. Davis could be made available for deposition any day.  A true and correct copy of my e-mail message to Mr. Brown is attached as Exhibit C; a true and correct copy of Mr. Brown's response to me is attached as Exhibit D.

<u>Meet and Confer regarding the Application</u>

34.   By e-mail message sent May 29, 2009, I advised Mr. Brown that Turner would apply ex parte for an order shortening time to brief and hear the Motion.  By e-mail message of that same date, Mr. Brown advised me that Welles did not oppose the Application, but requested that Welles be given one week to prepare an opposition to the Motion, due to the fact he is engaged in dispositive motion practice in another case.  Mr. Brown further expressed his preference that the hearing on the Motion take place on June 15.  Barring a hearing on June 15, Mr. Brown requested that the hearing take place telephonically.  True and correct copies of the correspondence between Mr. Brown and me are attached Exhibits E, F and G.

35.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed June 1, 2009, at Los Angeles, California.


_____
David W. Quinto

Pg. 34

DECLARATION OF DAVID W. QUINTO ISO TURNER'S EX PARTE APPLICATION FOR ORDER SHORTENING TIME AND MOTION FOR LEAVE

# EXHIBIT A

1    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     David W. Quinto (Bar No. 106232)
2    (davidquinto@quinnemanuel.com)
     Shahin Rezvani (Bar No. 199614)
3    (shahinrezvani@quinnemanuel.com)
     865 South Figueroa Street, 10th Floor
4    Los Angeles, California 90017-2543
     Telephone: (213) 443-3000
5    Facsimile: (213) 443-3100

6    Attorneys for Defendant and Counterclaimant
     Turner Entertainment Company

7

8             UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                WESTERN DIVISION

| | |
|---|---|
| 11   BEATRICE WELLES, | Case No. CV-08-01399 JFW (PJWx) |
| 12         Plaintiff, | |
| 13     v. | **TURNER'S DISCLOSURE OF REBUTTAL EXPERTS** |
| 14   TURNER ENTERTAINMENT CO., | Judge: Hon. John F. Walter |
| 15        Defendant, | Courtroom: 16 |
| 16 | Settlement Conference |
| | Cut Off:           June 1, 2009 |
| 17   AND RELATED COUNTERCLAIM. | Pre-Trial Conference: August 7, 2009 |
| | Trial:             August 25, 2009 |

18

19

20

21           CF 35

22

23

24

25

26

27

28           **EXHIBIT A**       Pg. 35

1   TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2           Please take notice that pursuant to Fed. R. Civ. P. 26(a)(2), Turner

3   Entertainment Co. ("Turner") hereby discloses the following people as experts it

4   may call upon to present evidence under F.R.E. 702, 703 and/or 705 in rebuttal to

5   the expert testimony of Mark Halloran and Steven Sills.

6

7

8           Professor Robert C. Lind, 3050 Wilshire Boulevard, Los Angeles,

9   California 90010, Telephone: 213-738-6785.

10          Pursuant to Fed. R. Civ. P. 26(a)(2)(B), the written reports of said

11  experts are served herewith.

12

13  DATED: April 27, 2009           QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

14

15

16                          By
                               David W. Quinto
17                             Shahin Rezvani
                               Attorneys for Defendant and
18                             Counterclaimant
                               Turner Entertainment Company

19

20

21

22

23

24

25

26

27

28                          **EXHIBIT A**          Pg. 36

-2-

TURNER'S DISCLOSURE OF REBUTTAL EXPERTS

# EXHIBIT B

# REDACTED
# Pages 37-103

Page 1 of 2

## Shahin Rezvani

**From:** David Quinto
**Sent:** Thursday, May 28, 2009 12:53 PM
**To:** Steven Ames Brown
**Cc:** Christopher Tayback; Shahin Rezvani
**Subject:** Economic Expert

Steven:

I'm writing to confirm our conversation yesterday concerning Turner's intent to seek leave to substitute a new economic expert, David Davis, to testify at trial.



You advised me that you were planning to depart for Florida for several days to attend your father's 90th birthday, which was to be a family reunion. You asked that defendant not bring any motion or ex parte application that might affect your family time. I agreed that defendant would not do so.



You advised me that you do not yet consider our meet-and-confer regarding Turner's request to substitute a new rebuttal economic expert to be concluded because you have not yet seen Mr. Davis's report. You agreed that Turner has acted expeditiously and that in the event Turner is required to seek leave to designate a new rebuttal economic expert, plaintiff will not argue that Turner has been dilatory in doing so or that plaintiff has been prejudiced by any delay (although, of course, plaintiff will be free to argue any other kind of prejudice).

If the above is inaccurate in any respect, please advise me immediately. Otherwise, please confirm that I have correctly stated matters.

## EXHIBIT C

Pg. 124

6/1/2009

thanks much,

David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3146
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: davidquinto@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**EXHIBIT C**        Pg. 125

## Shahin Rezvani

**From:** Steven Ames Brown [sabrown@entertainmentlaw.com]
**Sent:** Thursday, May 28, 2009 1:34 PM
**To:** David Quinto
**Cc:** Christopher Tayback; Shahin Rezvani
**Subject:** RE: Economic Expert

David:

I confirm your points except as clarified below.

Ms. Welles will not argue that the length of time it takes Turner to bring a motion to re-designate (should that become necessary) was prejudicial.  Not only have you shown me the courtesy of not disrupting my father's 90th birthday, but Mr. Davis has not yet rendered a report which I would need in order to ascertain whether any change in methodology may be prejudicial.  The contents of Mr. Davis' forthcoming report and the amount of time he takes to prepare it are separate issues from Turner's diligence, the latter of which will not be questioned by Ms. Welles because (a) we will not know if there is a disagreement until we have both studied the report, and (b) there will not be a complete record until there is a report to present to the Court.

I look forward to seeing Mr. Davis' signed report and, as always, your courtesy and cooperation are most appreciated.

Best,
Steven

**From:** David Quinto [mailto:davidquinto@quinnemanuel.com]
**Sent:** Thursday, May 28, 2009 12:53 PM
**To:** Steven Ames Brown
**Cc:** Christopher Tayback; Shahin Rezvani
**Subject:** Economic Expert

Steven:

I'm writing to confirm our conversation yesterday concerning Turner's intent to seek leave to substitute a new economic expert, David Davis, to testify at trial.

# EXHIBIT D

**Pg. 126**

# EXHIBIT D

You advised me that you were planning to depart for Florida for several days to attend your father's 90th birthday, which was to be a family reunion. You asked that defendant not bring any motion or ex parte application that might affect your family time. I agreed that defendant would not do so.

You advised me that you do not yet consider our meet-and-confer regarding Turner's request to substitute a new rebuttal economic expert to be concluded because you have not yet seen Mr. Davis's report. You agreed that Turner has acted expeditiously and that in the event Turner is required to seek leave to designate a new rebuttal economic expert, plaintiff will not argue that Turner has been dilatory in doing so or that plaintiff has been prejudiced by any delay (although, of course, plaintiff will be free to argue any other kind of prejudice).

If the above is inaccurate in any respect, please advise me immediately. Otherwise, please confirm that I have correctly stated matters.

thanks much,

David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3146
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: davidquinto@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**EXHIBIT D** 1        Pg. 127

6/1/2009

# EXHIBIT E

**Shahin Rezvani**

| | |
|---|---|
| **From:** | David Quinto |
| **Sent:** | Friday, May 29, 2009 4:54 PM |
| **To:** | Steven Ames Brown |
| **Cc:** | Christopher Tayback; Shahin Rezvani; John V. Schneider |
| **Subject:** | ex parte notice |

Steven:

This is to advise you that Turner will apply ex parte before Magistrate Judge Walsh with an application to shorten time to substitute rebuttal expert witness David Davis in place of ▮▮▮▮▮▮▮▮▮ Turner expects to present its application on Monday, June 1. Turner is seeking to shorten time to avoid delaying the trial and seeking to substitute its rebuttal expert for the reasons I have now discussed with you several times. Please advise me whether Welles will oppose the application and, if so, she requests to be heard.

Thanks very much,

David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3146
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail:  davidquinto@quinnemanuel.com
Web:  www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**EXHIBIT E**   Pg. 128

6/1/2009

# EXHIBIT F

**Shahin Rezvani**

| | |
|---|---|
| **From:** | Steven Ames Brown [sabrown@entertainmentlaw.com] |
| **Sent:** | Friday, May 29, 2009 5:22 PM |
| **To:** | David Quinto |
| **Cc:** | Christopher Tayback; Shahin Rezvani; John V. Schneider |
| **Subject:** | RE: ex parte notice |

David:

I do not object to an order shortening time for a motion to substitute Turner's expert providing, however, that I receive no less than one week from the service of the motion in which to e-file an opposition (I can have a chambers copy delivered the next day.) Further, it would be best if the motion is heard on June 15th. On shortened time there is no justification for losing time for a reply brief.

The 15th is especially desirable if you'd like to take Mark Halloran's deposition on the 15th or 16th. As I had previously told you, Mr. Halloran only needed a few days to recuperate from his two weeks on the stand and has been available for his deposition since. Also, I'd like to reduce the number of trips I have to make to Los Angeles. If you depose Mr. Halloran on the 15th or 16th, I'd like to depose Mr. Lind the next day. Mr. Halloran will be out of the state the next week and has a pressing schedule after that.

It seems to me this would be efficient scheduling for the parties. Turner would have a prompt resolution of its motion, and the other expert depositions could be completed. That would prevent us from being backed up on discovery as we approach preparing the pretrial papers.

For the record, I do not believe an adequate "meet and confer" has taken place on Turner's motion for the reasons I have previously stated.

If you'd be so kind as to confirm Turner's intentions concerning the hearing date I'd much appreciate it.

As always, your courtesy and cooperation are most appreciated.

Best,
Steven Ames Brown

**From:** David Quinto [mailto:davidquinto@quinnemanuel.com]
**Sent:** Friday, May 29, 2009 4:54 PM
**To:** Steven Ames Brown
**Cc:** Christopher Tayback; Shahin Rezvani; John V. Schneider
**Subject:** ex parte notice

Steven:

This is to advise you that Turner will apply ex parte before Magistrate Judge Walsh with an application to shorten time to substitute rebuttal expert witness David Davis in place of ▆▆▆▆▆▆▆ Turner expects to present its application on Monday, June 1. Turner is seeking to shorten time to avoid delaying the trial and seeking to substitute its rebuttal expert for the reasons I have now discussed with you several times. Please advise me whether Welles will oppose the application and, if so, she requests to be heard.

**EXHIBIT F**

Pg. 129

Thanks very much,

David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3146
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: davidquinto@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**EXHIBIT F**

Pg. 130

6/1/2009

# EXHIBIT G

## Shahin Rezvani

| | |
|---|---|
| **From:** | Steven Ames Brown [sabrown@entertainmentlaw.com] |
| **Sent:** | Friday, May 29, 2009 6:45 PM |
| **To:** | David Quinto |
| **Cc:** | Christopher Tayback; Shahin Rezvani; John V. Schneider |
| **Subject:** | RE: ex parte notice |

David:

One more point, if I may. If you decide not to hold the Halloran and Lind depositions in conjunction with a June 15th hearing I'd very much appreciate if you would request I be given the option of a telephonic appearance at the hearing. You already know my client's circumstances and your courtesy would be very much appreciated by me.

Thanks,
Steven

**From:** David Quinto [mailto:davidquinto@quinnemanuel.com]
**Sent:** Friday, May 29, 2009 4:54 PM
**To:** Steven Ames Brown
**Cc:** Christopher Tayback; Shahin Rezvani; John V. Schneider
**Subject:** ex parte notice

Steven:

This is to advise you that Turner will apply ex parte before Magistrate Judge Walsh with an application to shorten time to substitute rebuttal expert witness David Davis in place of ▮▮▮▮▮▮▮ Turner expects to present its application on Monday, June 1. Turner is seeking to shorten time to avoid delaying the trial and seeking to substitute its rebuttal expert for the reasons I have now discussed with you several times. Please advise me whether Welles will oppose the application and, if so, she requests to be heard.

Thanks very much,

David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3146
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: davidquinto@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**EXHIBIT G**   Pg. 131

6/1/2009

**EXHIBIT G**     Pg. 132

6/1/2009

# REZVANI DECLARATION

## DECLARATION OF SHAHIN REZVANI

I, Shahin Rezvani, say that:

1.     I am an attorney admitted to practice before this Court. I am associated with Quinn Emanuel Urquhart Oliver & Hedges, LLP, counsel for record for defendant and counterclaimant Turner Entertainment Co. ("Turner"). I make this declaration of my personal and firsthand knowledge and, if called and sworn as a witness, could and would testify competently hereto.

2.     Attached as Exhibit A is a true and correct copy of the Rebuttal Expert Report of David Davis, served on Steven Ames Brown, counsel for Plaintiff and Counterclaim Defendant Beatrice Welles, on June 11, 2009.

3.     Attached as Exhibit B is a true and correct copy of the Court's July 14, 2009 Minute Order (Docket Entry No. 121) granting in part Turner's motion to reset the discovery and motion cut-off dates to allow Turner to file the instant motion to substitute.

4.     Attached as Exhibit C is a true and correct copy of the Court's October 14, 2008 Scheduling and Case Management Order (Docket Entry No. 22).

5.     Attached as Exhibit D is a true and correct copy of July 14, 2009 e-mail correspondence between David W. Quinto, one of Turner's counsel of record, and Mr. Brown confirming that the parties have met and conferred on the relief sought by Turner's instant motion to substitute.

6.     Turner made its first attempt to obtain the relief sought by the instant on motion on June 1, 2009. For procedural reasons not germane to the merits of the motion, the court did not grant leave to file this motion until July 14, 2009.

7.     On June 5, 2009, I was informed by the Court's clerk that its ex parte application had been denied.

8.     Believing that its unopposed ex parte application to shorten time had been denied because Turner had not also sought leave to re-open discovery, on June 8, 2009, Turner brought a noticed Motion to Reset the Discovery Cut-Off Date,

-2-

1    Substitute Rebuttal Expert Witness David Davis in Place of ███████, and File

2    under Seal All Papers Related thereto.

3         9.    On June 9, 2009, the Court entered a Minute Order  (Docket Entry No.

4    84) denying Turner's motion, without prejudice, on the basis that Turner should

5    have sought *only* leave to re-open discovery.  The Court explained that if the Court

6    granted such motion, Turner could then seek leave from the Magistrate Judge to

7    substitute rebuttal expert witness David Davis in place of ████████.

8         10.   On June 15, 2009, Turner filed a separate motion to reset the discovery

9    and motion cut-off dates to allow the instant motion to be heard.

10        11.   By Minute Order entered June 18, 2009 (Docket Entry No. 93), the

11   Court ordered, among other things, that Turner retrieve its moving papers for failure

12   to comply with the <u>Local Rules</u> regarding the filing of documents under seal.

13        12.   Turner corrected the deficiencies in its papers and, on June 25, 2009,

14   re-filed its Motion to Reset.

15

16        I declare under penalty of perjury under the laws of the United States of

17   America that the foregoing is true and correct.

18        Executed July 16, 2009, at Los Angeles, California.

19

20

21                                          _____

22                                                Shahin Rezvani

23

24

25

26

27

28

00770.07015/3010261.2

·▲  **Pg. 134**

DECLARATION OF SHAHIN REZVANI IN SUPPORT OF TURNER ENTERTAINMENT CO.'S MOTION TO SUBSTITUTE REBUTTAL EXPERT WITNESS

# EXHIBIT A



Expert Report of David Davis, Managing Partner
In Rebuttal to the Report of Steven D. Stills

In the Matter of
Beatrice Welles v. Turner Entertainment Co.

United States District Court

Central District of California (08-1399)

Arpeggio Partners, LLC
1112 Montana Avenue-378
Santa Monica, Ca 90403

June 10, 2009

**EXHIBIT A**

# Contents

I. Introduction .............................................................................................3

II. Expert Qualification ................................................................................3

III. Standards Used ......................................................................................4

IV. Diligence Performed...............................................................................5

V. Copyright Royalty ...................................................................................7

   A. Method Used to Determine the Negotiated Reasonable Copyright Royalty....7
   B. Method Used to Determine the Royalty for a Screenplay Copyright ..........9
   C. Method Used to Determine the Royalty for a Co-Writer Share.................10

VI. Profit Participation .................................................................................11

   A. Method Used to Determine the Profit Participation ..................................11

VII. Summary Opinions.................................................................................13

   A. Copyright Royalty...................................................................................13
   B. Profit Participation ..................................................................................13
   C. Interest ...................................................................................................14
   D. Non-Video Participation .........................................................................14

VIII.     David Davis Litigation Testimony Experience ....................................15

**EXHIBIT A** pg. 136

## I. Introduction

David Davis, Managing Partner of Arpeggio Partners, LLC ("I "or "Arpeggio" hereinafter ) was retained by Turner Entertainment Co. ("Turner" hereinafter) to provide advisory and consulting services in regards to the matter of Beatrice Welles v. Turner Entertainment Co., case number 08-1399 in the United States District Court for the Central District of California.   These services include, but are not limited to, the rebuttal of the expert report of Steven D. Sills ("Sills" hereinafter).

Further, It is my understanding that a settlement agreement and release ("Settlement Agreement" hereinafter) were entered into in March 2005 that dealt with the specific issue of:

1) a potential, to-be-negotiated reasonable screenplay copyright royalty for the film *Citizen Kane*  ("Copyright Royalty" hereinafter) and,

2) a 20% profit participation in the film *Citizen Kane*   ("Profit Participation" hereinafter).

I have been asked by Turner to render Opinions for a negotiated reasonable Copyright Royalty and Profit Participation in this matter.  This report conveys my conclusions and describes the investigations, methodology, and analyses I employed to arrive at these conclusions.

## II. Expert Qualification

I have been analyzing the entertainment business and advising companies since 1989.  I have testified and consulted in over 50 litigation matters since 1990.  A detailed summary of my litigation testimony experience is listed in Section VIII.

3

**EXHIBIT A** Pg. 137

## III. Standards Used

To apply the judicial test for a hypothetical negotiation between the parties, I have conducted my investigation to determine the equivalent to a "Fair Market Value" standard for the Copyright Royalty in this matter based on widely accepted industry standards and comparable transactions.   The Fair Market Value is normally defined as the price at which an asset or right  would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each having reasonable knowledge of all relevant facts.  This standard is consistent with the end result of a hypothetical negotiation between the parties.

The market approach (or sales comparison approach), which is a commonly accepted form of Fair Market Value involves estimating value based on market transactions of similar assets.  After studying the market data, the expert makes value adjustments for comparability differences to derive value indications for the subject asset.  This approach, using industry accepted methods and comparables was the primary focus used in this analysis.
In this matter, I considered the specific rights and privileges of the Copyright Royalty, given the specific rights held and based on long-term industry standards and comparable situations.

I have also used the Market Approach with respect to the manner in which profit participations are calculated.    I have reviewed many comparable participation statements.

4

EXHIBIT A

## IV. Diligence Performed

In preparing the analysis, I have relied on the following documents, identified by their bate stamped numbers, when available:

TE 00157-TE212, Warner Documents

I also reviewed:

Deposition of Katherine Chilton (pages 1-167)

Deposition of Steven D. Sills (pages 1-138 plus attachments)

Expert Report of Steven D. Sills

Rebuttal of the Expert Report of Steven D. Sills by ▮▮▮▮▮

First Amended Complaint

Turner Entertainment Company's Answer to First Amended Complaint

Settlement Agreement and Release, March 15, 2005 and November 2007

I have also reviewed certain publicly-available information and purchased industry research reports in regards to the Copyright Royalties and Profit Participations. I found this information in the following articles, books and court law:

- The Licensing Letter Royalty Trends Report, 2008 Edition
- Entertainment Industry Economics, Vogel 2008 Edition
- Georgia-Pacific Corporation v. United States Plywood Corp, Civ. A No. 99-105, Westlaw, pages 1-25
- Royalty stat Report: Medianet Group Technologies. Inc.
- Royalty stat Report: Advanced Media  Inc.
- Discussion with Fernando ▮▮▮▮▮

5

 EXHIBIT A Pg. 139

- Discussion with other Industry Participations
- Closing Argument by Brooke S. Wharton, LA Lawyer May 2006
- Making Sense of These Million Dollar Babies, Liyuan Wei, Rotman School of Management, University of Toronto
- Less Than Zero, Studio Accounting Practices in Hollywood by Joseph F. Hart and Philip J. Hacker, C.P.A.
- Boffo at the Box Office, Business Week, December 2, 2001
- Violence in vogue on bags, T-shirts, The Washington Times, 7/6/2007
- For Some, Royalties at Last, The Washington Post, 3/1/1995
- WRITERS CUT DEAL FOR SLICE OF PROFIT; TOP SONY SCREENPLAYS TO GET MORE THAN GLORY, Daily News, 2/5/1999

Prior to my deposition, I may consider additional material. I have also relied on my knowledge of the feature film finance production and distribution business. I have performed valuation analysis and financial advisory work regarding feature film finance production and distribution with many companies such as Paramount, Universal Studios, Fox, Sony, Time Warner and Disney as well as many smaller independents in the U.S. and abroad.

6

**EXHIBIT A**

## V. Copyright Royalty

A. <u>Method Used to Determine the Negotiated Reasonable Copyright Royalty</u>

Sills provides no support for his selection of a 20% copyright royalty other than mistakenly comparing his selection to the 20% home video profit "royalty" generally used in calculating studio profit participations. This participation "royalty" is not comparable to copyright royalty rates, which are widely discussed and studied, in literature as well as in media company business practices. In his deposition, he claims that he additionally bases his opinion on his years of reviewing internal studio agreements. However, in my experience, participation audits like the ones Sills performs for his clients consider participation issues and would not, deal with the issue of copyright royalty rates, which is the area of valuation experts, not auditors.

In determining a negotiated reasonable Copyright Royalty rate, I used the Market Approach based on comparable market rates that have been observed.

Further, since the Settlement Agreement calls for a negotiation of a reasonable Copyright Royalty in Citizen Kane, I have considered the <u>Georgia Pacific</u> factors which are typically used in negotiations between parties that are in litigation.

The key <u>Georgia Pacific</u> points that apply consider that:

        2) the rates paid are comparable to those paid in the suit
        3) the nature and scope is similar a la exclusivity and territory
        7) duration of term and especially,
        12) the portion of the profit that may be customary in the particular business

Information in regards to copyright royalty rates sometimes appears in public sources, some of which I cite below and are listed in Section IV above and are usually reliable.

7

**EXHIBIT A** 4     **Pg. 141**

The highest regarded source for information on copyright royalty rates is The Licensing Letter Royalty Trends Report, a specialist research report, published by EPM Communications, Inc.  The most current edition is the 2008 edition.

According to Royalty Trends Report, "The average industry-wide royalty rate in the consumer products licensing business in the U.S. and Canada in 2007 was 8.7%, according to The Licensing Letter's Annual Licensing Business Survey. That's in line with results for most of the previous decade." (Introduction, p. i). The royalty rate is typically applied against wholesale revenues.

In addition, the average rate is 9.3% for celebrities and estates and 10.3% for entertainment/characters.  My personal observation in the filmed entertainment industry based on working as a financial advisor since 1989 is that royalty rate specifically in filmed entertainment is almost entirely between 5% and 10%. There are examples above 10%, however they are extremely rare.  Two such examples of a rate above 10% according to a 2001 Business Week article were the 15% Mattel paid Time Warner for Harry Potter rights and the 20% Hasbro reportedly paid Lucas Licensing for Star War's Phantom Menace.  Again, these examples are extremely rare and are attributed to two of the very highest performing franchises in movie history, each generating multiple billions of dollars in revenue over a series of films.  The critical acclaim of the 69 year-old film Citizen Kane does not compare to the massive financial success of movie franchises and therefore would not receive comparable royalty rates as high as a 15% a Harry Potter would receive for example.

According to the Royalty Trend Report, while overall entertainment and character-based license merchandise had a 10.3% average royalty rate, "longer-term 'evergreen' properties tend towards slightly lower royalty rates" (p.20).

An example and a more comparable rate to Citizen Kane is the 10% royalty rate reported by Royalty Stat from publically filed documents, paid by the Good Times DVD/Home Video Company to the owners of the Howdy Dowdy copyright for the rights to distribute the TV series on DVD and Home Video.   Howdy Dowdy is an evergreen entertainment franchise from the 1950s.

8

**EXHIBIT A**

**Pg. 142**

Based on the above, I would conclude that a reasonable royalty rate for Turner to license the copyright for the film Citizen Kane would be in the range of 8% to 10% of wholesale revenues generated by Turner Entertainment Co.

## B. Method Used to Determine the Royalty for a Screenplay Copyright

Sills does not differentiate between a copyright royalty for a motion picture and one solely designed for a screenplay.

In general practice, the screenwriter receives a limited profit participation in a feature film. While a key actor or director or producer may receive as much as 20% to 25% of adjusted gross (which typically tracks non-video at 100% and home video and DVD at 20% of revenues), a key screenwriter usually will receive as most, a 2.5% adjusted gross participation, which is only on a scale of one-tenth as much as the actor and or director may receive.

In 1999, Sony Pictures attempted to attract top-shelf writers with this specific deal according to the Daily News (2/5/99):

> Nearly three dozen of Hollywood's top screenwriters reached an unprecedented deal Thursday with Sony Corp. that will pay them a significant cut of profits if their films are hits. The deal was instigated by 34 writers who have won or been nominated for 21 Academy Awards. Each will now deliver at least one script to Sony over the next four years at the fee from their last film, but can earn much more if their movies turn into box office hits.... The basic agreement gives writers 2 percent of Sony's gross receipts from a movie.

I have never personally observed the separation of the screenplay copyright segmented from the bundle of rights of the complete motion picture, which I understand to include the rights of reproduction, derivative works, distribution, and public performance, among others. Given the relative weight of the screenwriter to other elements of a film, at most, I would expect that the screenplay copyright would make up 50% of the overall copyright of the motion

9

**EXHIBIT A-**

picture ,especially considering the compensation of writers relative to actors,
directors and producers.

Thus, if asked at trial to determine a reasonable copyright royalty for the
screenplay of Citizen Kane, I would conclude that it would be in a range of 50%
of the entire copyright, thus, taking 50% of the 8% to 10% range I opine to above,
it would be be in the range of 4% to 5% of wholesale revenues generated by
Turner Entertainment Co.

### C. Method Used to Determine the Royalty for a Co-Writer Share

Sills did not account for the existence of a co-writer.

In the case of the screenplay of Citizen Kane, there are two writers credited on
the film, Orson Welles and Herman Mankiewicz.  Each also received an
Academy Award in 1941 for best screenplay.

Therefore, if asked at trial to determine Orson Welles's reasonable share of the
copyright royalty for the screenplay of Citizen Kane, I would divide the screenplay
into two pieces with a 50% interest.

Further, I would conclude that a 50% interest in the screenplay copyright would
then result in a total royalty in the range of 2% to 2.5% of wholesale revenues
generated by Turner Entertainment Co.

I would then apply this percentage against the wholesale revenues which Turner
has generated since its purchase of the distribution rights to Citizen Kane as part
of its purchase of RKO.

Finally, using the $37.6 million in wholesale video revenues from the Sills Report,
the calculation for the Copyright Royalty would equal $752,000 to $940,000.

10

## VI. Profit Participation

A. <u>Method Used to Determine the Profit Participation</u>

In determining the Profit Participation, I used the Market Approach based on comparable definition of profits that have been observed.

The Sills approach of applying the 20% toward gross wholesale revenues ignores the industry standards. Factor 12 from the <u>Georgia Pacific</u> case specifically says that parties in a dispute should consider: "The portion of the profit or the selling price that may be customary in the particular business." The 20% video rate in participation statements is the norm in the industry and customary.

The Sills conclusion runs counter to industry practices and standards and is not based on any precedents. It is the general approach used by advocates on behalf of talent and runs counter to industry contracts signed by more than 99% of industry participants. Sills is a well regarded forensic auditor, but his role is as an advocate for talent. Here he takes an advocate's point of view, rather than the traditional role of a Court expert witness, which is to find the most appropriate solution to the issue at hand.

While there is a lot of mention in media sources about Hollywood accounting practices, the reality is that there are generally accepted accounting practices and industry standard contract terms and profit terms which are consistent among virtually all industry professionals. For example, there is a standard profit definition that is used by the major studios and virtually integrated media companies. According to Hart and Hacker, there is a Standard Profit Definition or SPD. "While the SPD's of the various studios are not identical, they share many common structures and definitions. (p. 2 of 8)

According to Hart and Hacker, "All the major studios have home video distribution affiliates that sell video cassettes to wholesalers and retailers throughout the world. The SPD for all major distributors provides that 20 percent of the sums actually received by such affiliated companies will be included in

11

**EXHIBIT A** .⁴ **Pg. 145**

gross receipts." Phil Hacker is another well regarded forensic auditor, who acts in the same role as Mr. Sills in the industry.

In Entertainment Industry Economics by Harold L. Vogel, the most widely used academic text (now in its 7th edition), the industry standard 20% definition is again shown as being the standard.

As part of financial advisory and valuation projects, I have personally reviewed thousands, if not more, profit participation statements since 1989. With rare exceptions, home video and DVD are calculated under the 20% method. The rare exceptions occur with respect to the very few highest profitable and highest regarded contemporary actors, directors and producers.

Therefore, I would conclude that the calculation of Ms. Welles 20% participation in DVD should be based on the industry standard definition of a 20% video royalty.

Before calculating a 20% percentage profit participations from the $7.6 million video royalty portion from the Sills analysis of the Turner video data, one needs to subtract appropriate deductions. If the Court deems that Welles is entitles to a Copyright Royalty, this amount of $752,000 to $940,000 would need to be deducted.

Using the $7.6 million figure as reported by Turner in the Sills report, I would first subtract the $752,000 to $940,000 amount attributed to the screenplay copyright royalty, yielding approximately $6.8 million to $6.9 million. I would then multiply those figures by 20%, thus getting a $1.36 million to $1.38 million amount due to Ms. Welles from home video exploitation in the period up to 2007.

12

**EXHIBIT A**

Pg. 146

## VII. Summary Opinions

### A. Copyright Royalty

I conclude that an appropriate Copyright Royalty for Beatrice Welles' co-writer share of a screenplay copyright would be in the range of 2.0% to 2.5%.

Using the $37.6 million in wholesale video revenues, the Copyright Royalty would equal $752,000 to $940,000.

I reserve the right to modify these conclusions based on the observation of additional data or information from the parties.

. .

### B. Profit Participation

I conclude that the 20% Profit Participation should be calculated from the industry standard of a 20% of wholesale revenues video royalty.

Using the $7.6 million figure as reported by Turner in the Sills report, I would first subtract the $752,000 to $940,000 amount attributed to the screenplay copyright royalty, yielding approximately $6.8 million to $6.9 million.   I would then multiply those figures by 20%, to get a $1.36 million to $1.38 million amount due Ms. Welles from home video exploitation in the period up to 2007.

I reserve the right to modify these conclusions based on the observation of additional data or information from the parties.

13

**EXHIBIT A**    Pg. 147

C. Interest

If instructed by the Court, I would further add interest to the foregoing
calculations.   It is my understanding that there is a 10% legal rate that would
apply to liquidated sums in this matter.

D. Non-Video Participation

I concur with the calculations made by Mr. Sills, which are based on industry
standards and methods.

I reserve the right to modify these conclusions based on the observation of
additional data or information from the parties.

David Alan Davis
Managing Partner
Arpeggio Partners
Santa Monica, CA 90403

June 10, 2009

14

**EXHIBIT A**     Pg. 148

## VIII. David Davis Litigation Testimony Experience

*Icon Productions vs. Kings Road,* (1996)
Arbitration testimony for Icon Productions in matter involving valuation of feature films.

*Jeffrey Katzenberg vs. Walt Disney Company,* (1999)
Lead Valuation Expert Witness for the Walt Disney Company. Eight-days of Deposition testimony for the Walt Disney Company in litigation matter involving the valuation of 5,000 filmed entertainment assets

*Beacon Productions and Universal Studios in Kinovelt vs. Beacon/Universal,* (2002) Deposition and Arbitration testimony for Beacon and Universal in regards to the value of the film Spy Games in Germany,

*Entertainment GmbH vs. Franchise Pictures,* (2002)
Deposition testimony for Entertainment in regards to the value of filmed asset rights.

*Ivy Street vs. Sony Pictures,* (2002)
Deposition testimony for Sony Pictures in regards to the fair market value of the license fees for the TV series Married with Children series

*Apollo Theater vs. Western International Syndication,* (2004)
Deposition testimony for Western in regards with the TV series It's Showtime at the Apollo.

*Sony Pictures and Aon binding arbitration,* (2005)
Deposition testimony for Aon Re: in regards with film insurance partnership

*Cho Taussig Productions, Inc. (Karen Taussig vs. Margaret Cho)* (2008)
Santa Monica Court testimony as neutral third-party in Section 2000C matter

*Wolf vs. Loring Ward,* (2008)
Deposition testimony regarding valuation of *Law & Order* television series.

15

**EXHIBIT A**     Pg. 149

# EXHIBIT B

Case 2:08-cv-01399-JFW-PJW   Document 121   Filed 07/14/2009   Page 1 of 3

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**PRIORITY SEND**

### CIVIL MINUTES -- GENERAL

Case No.    **CV 08-1399-JFW (PJWx)**                    Date:  July 13, 2009

Title:    Beatrice Welles -v- Turner Entertainment Co.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

Shannon Reilly                          None Present
Courtroom Deputy                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:
            None                                    None

PROCEEDINGS (IN CHAMBERS):      **ORDER GRANTING IN PART AND DENYING IN PART
                                TURNER ENTERTAINMENT COMPANY'S MOTION TO
                                (1) RESET THE DISCOVERY AND MOTION CUT-OFF
                                DATES TO PERMIT A MOTION FOR LEAVE TO
                                SUBSTITUTE EXPERTS AND ALLOW THE
                                COMPLETION OF THE REMAINING EXPERT
                                DEPOSITIONS, AND (2) CONTINUE THE TRIAL DATE
                                AND ASSOCIATED PRE-TRIAL DATES [filed 6/26/09;
                                Docket No. 115]**

On June 26, 2009, Defendant Turner Entertainment Company ("Defendant") filed a Motion to
(1) Reset the Discovery and Motion Cut-Off Dates to Permit a Motion for Leave to Substitute
Experts and Allow the Completion of the Remaining Expert Depositions, and (2) Continue the Trial
Date and Associated Pre-Trial Dates ("Motion").  On July 6, 2009, Plaintiff Beatrice Welles
("Plaintiff") filed her Opposition.  On July 13, 2009, Defendant filed a Reply.  Pursuant to Rule 78 of
the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is
appropriate for decision without oral argument.  The hearing calendared for July 20, 2009, is
hereby vacated and the matter taken off calendar.  After considering the moving, opposing, and
reply papers and the arguments therein, the Court rules as follows:

On October 14, 2008, the Court issued its Scheduling and Case Management Order
("CMO").  Federal Rule of Civil Procedure 16(b) provides that "a schedule shall not be modified
except upon a showing of good cause and by leave of the district judge."  Fed. R. Civ. P. 16(b).  As
the Ninth Circuit explained:

> The district court may modify the pretrial schedule if it cannot reasonably
> be met despite the diligence of the party seeking the extension.

Initials of Deputy Clerk _sr_

**EXHIBIT** B          Pg.  150

> Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus on the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson*, 975 F.2d at 609  (citations and quotations omitted). "As Rule 16 recognizes, scheduling orders are at the heart of case management, and are intended to alleviate case management problems" and "good-faith compliance with Rule 16 plays an important role in this process." *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999) (citations and quotations omitted). Accordingly, to demonstrate diligence, the moving party is required to show: (1) that it was diligent in assisting the Court in creating a workable Rule 16 scheduling order; (2) that its noncompliance with the scheduling order's deadline occurred or will occur notwithstanding diligent efforts to comply because of "the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference;" and (3) that it was diligent in seeking amendment of the scheduling order once it became apparent it could not comply with the order. *Id.* at 608.  Finally, the Ninth Circuit has stated that "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609.

In this case, the Court **GRANTS** Defendant's Motion with respect to continuing the discovery and motion cut-off dates for the limited purpose of permitting Defendant to bring a motion before Magistrate Walsh to seek leave to replace its previously-designated rebuttal economic expert[1] with David Davis.

However, Defendant has failed to demonstrate good cause as to why the discovery and motion cut-off dates should be continued with respect to allowing the parties to complete other expert discovery, including specifically the depositions of Mark Halloran and Professor Robert Lind. Defendant argues that it:

> . . . did not initially seek to reset the discovery cut-off date because it believed, albeit erroneously, that Turner's and Welles's expert depositions properly noticed to occur before the discovery cut-off date could take place after the cut-off date, by the parties' own stipulation and without a Court order re-opening discovery, as long as the depositions did not impact the scheduling order.

Motion, 6:22-26. The Court finds this argument unpersuasive. The CMO specifically states that:

> No applications or stipulations extending the time to file any required document or to continue any date are effective until and unless the Court approves them.

CMO, 6:10-12. Moreover, while Defendant argues that Mr. Halloran's deposition was scheduled to take place prior to the May 21, 2009 discovery cut-off date and was postponed at Mr. Halloran's

---

[1] To protect the previously-designated rebuttal economic expert's confidentiality, the Court will not use his name in this Order.

request[2], it was, in fact, scheduled to take place mere days prior to the discovery cut-off date – May 18, 2009.  Once again, the CMO warns the parties that:

> All discovery shall be completed by the discovery cut-off date specified on the last page of this Order.  **THIS IS NOT THE DATE BY WHICH DISCOVERY REQUESTS MUST BE SERVED; IT IS THE DATE BY WHICH ALL DISCOVERY, INCLUDING EXPERT DISCOVERY, IS TO BE COMPLETED.**
>
> Any motion challenging the adequacy of responses to discovery must be heard sufficiently in advance of the discovery cut-off date to permit the responses to be obtained before the date if the motion is granted.

CMO, 3:15-23 (emphasis in the original); *see, also,* CMO, 3:27-4:3 ("All depositions shall be scheduled to commence sufficiently in advance of the discovery cut-off date to permit their completion and to permit the deposing party enough time to bring any discovery motions concerning the deposition prior to the cut-off date.").  Accordingly, Defendant's request to continue the discovery and motion cut-off dates to allow the parties to complete other expert discovery, including specifically the depositions of Mark Halloran and Professor Robert Lind, is **DENIED.**

The Court concludes that it is unnecessary to consider Defendant's request to continue the trial date and associated pre-trial dates set by the Court in its CMO until Magistrate Walsh rules on Defendant's anticipated motion to substitute its rebuttal economic expert.  Accordingly, Defendant's request to continue the trial date and associated pre-trial dates is **DENIED without prejudice.**

Accordingly, Plaintiff's Motion is **GRANTED in part, and DENIED in part.**  It is granted with respect to continuing the discovery and motion cut-off dates for the limited purpose of permitting Defendant to bring a motion before Magistrate Walsh to seek leave to replace its previously-designated rebuttal economic expert with David Davis, and denied with respect to otherwise extending the discovery and motion cut-off dates.  It is denied without prejudice with respect to continuing the trial date and associated pre-trial dates.  Defendant's motion before Magistrate Walsh to seek leave to replace its previously-designated rebuttal economic expert with David Davis must be filed with Magistrate Walsh, in accordance with Magistrate Walsh's procedures for such motions.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.

---

[2]  Because Professor Lind was testifying as a rebuttal expert to Mr. Halloran, his deposition was apparently postponed when Mr. Halloran's deposition was postponed, and it was anticipated that Professor Lind's deposition would be re-scheduled to a date after Mr. Halloran's deposition.

# EXHIBIT C

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  Beatrice Welles,              )   Case No. CV 08-1399-JFW (PJWx)
                                  )
12              Plaintiff,        )   SCHEDULING AND CASE MANAGEMENT
                                  )   ORDER
13      v.                        )
                                  )   SEE LAST PAGE FOR TRIAL AND
14  Turner Entertainment Co.,     )   PRE-TRIAL DATES
                                  )
15              Defendants.       )
                                  )
16  _____)

17      The purpose of this Order is to enable the parties and

18  their counsel to know well in advance the schedule that will

19  govern this action.  SEE THE LAST PAGE OF THIS ORDER FOR THE

20  SPECIFIED DATES.  Ordinarily, the dates set forth on the last

21  page are determined after consultation with the parties at

22  the Fed.R.Civ.P. 16(b) Scheduling Conference and this Order

23  is distributed to them at that time.  Accordingly, the dates

24  and requirements are firm.  The Court is very unlikely to

25  grant continuances, even if stipulated by the parties, unless

26  the parties establish good cause through a concrete showing.

27  **Because this Order in some respects modifies the applicable**

28  **Local Rules, counsel are advised to read it carefully to**

1  avoid default on the obligations established herein.  Counsel
2  are advised to pay particular attention to the requirements
3  of the Court with respect to electronic filing, the filing of
4  motions for summary judgment, and the documents to be
5  submitted at the Pre-Trial Conference and Trial.
6        IT IS HEREBY ORDERED:
7  1.    **ELECTRONIC FILING AND COURTESY COPIES**
8        All documents that are required to be filed in an
9  electronic format pursuant to General Order No. 08-02 shall
10 be filed electronically no later than 4:00 p.m. on the date
11 due unless otherwise ordered by the Court.  Any documents
12 filed electronically after 4:00 p.m. on the date due will be
13 considered late and may be stricken by the Court.  Any
14 documents that counsel attempt to file electronically which
15 are improperly filed <u>will not</u> be accepted by the Court.
16       Counsel are ORDERED to deliver **2 courtesy copies** of all
17 documents filed electronically to Chambers.  For each
18 document filed electronically, one courtesy copy shall be
19 marked "CHAMBERS COPY" and the other shall be marked
20 "COURTESY COPY."  On the first page of each courtesy copy, in
21 the space between lines 1 - 7 to the right of the center,
22 counsel shall include the date the document was e-filed and
23 the document number.  The courtesy copies shall be delivered
24 to Chambers no later than 10:00 a.m. on the next business day
25 after the document was electronically filed.
26       For any document that is not required to be filed
27 electronically, counsel are ORDERED to deliver 1 conformed
28

2

**EXHIBIT** C 4

Pg. 154

1  courtesy copy of the document to Chambers **at the time of**
2  **filing**.

3      When a proposed order accompanies an electronic filing, a
4  WordPerfect or Word copy of the proposed order, along with a
5  copy of the PDF electronically filed main document, shall be
6  e-mailed to JFW_Chambers@cacd.uscourts.gov.  The subject line
7  of the e-mail shall be in the following format: court's
8  divisional office, year, case type, case number, document
9  control number assigned to the main document at the time of
10 filing, judge's initials and filer (party) name.  Failure to
11 comply with this requirement may result in the denial or
12 striking of the request or the Court may withhold ruling on
13 the request until the Court receives the required documents.
14 **2.  DISCOVERY**

15     All discovery shall be completed by the discovery cut-off
16 date specified on the last page of this Order.  **THIS IS NOT**
17 **THE DATE BY WHICH DISCOVERY REQUESTS MUST BE SERVED; IT IS**
18 **THE DATE BY WHICH ALL DISCOVERY, INCLUDING EXPERT DISCOVERY,**
19 **IS TO BE COMPLETED.**

20     Any motion challenging the adequacy of responses to
21 discovery must heard sufficiently in advance of the discovery
22 cut-off date to permit the responses to be obtained before
23 that date if the motion is granted.

24     In an effort to provide further guidance to the parties,
25 the Court notes the following:

26     **(a)  Depositions**

27     All depositions shall be scheduled to commence
28 sufficiently in advance of the discovery cut-off date to

**EXHIBIT** ᘞ **4**  Pg. 155

1   permit their completion and to permit the deposing party

2   enough time to bring any discovery motions concerning the

3   deposition prior to the cut-off date.

4       **(b)   Written Discovery**

5       All interrogatories, requests for production of

6   documents, and requests for admissions shall be served

7   sufficiently in advance of the discovery cut-off date to

8   permit the discovering party enough time to challenge (via

9   motion practice) responses deemed to be deficient.

10      **(c)   Discovery Motions**

11      Whenever possible, the Court expects the parties to

12  resolve discovery issues among themselves in a courteous,

13  reasonable, and professional manner.  If they do so, resort

14  to the Court for guidance in discovery is seldom necessary.

15  The Magistrate Judge assigned to this case will rule on

16  discovery motions.

17      **(d)   Expert Discovery**

18      If expert witnesses are to be called at trial, the

19  parties shall designate _affirmative_ experts to be called at

20  trial and shall provide reports required by Fed.R.Civ.P.

21  26(a)(2)(B) not later than eight weeks prior to the discovery

22  cut-off date.  _Rebuttal_ expert witnesses shall be designated

23  and reports provided as required by Fed.R.Civ.P. 26(a)(2)(B)

24  not later than five weeks prior to the discovery cut-off

25  date.  Any non-retained expert designated by a party as an

26  affirmative or rebuttal expert shall also prepare and provide

27  an expert report in the form described by Fed.R.Civ.P.

28  26(a)(2)(B).  Expert witnesses will be bound by the opinions

4

EXHIBIT U 4

Pg. 156

1 expressed in their reports prepared in accordance with
2 Fed.R.Civ.P. 26(a)(2)(B) and will not be permitted to offer
3 new matters at trial. Failure to timely comply with this
4 deadline will result in the expert being excluded at trial as
5 a witness.

6 **3. MOTIONS - GENERAL PROVISIONS**

7     All law and motion matters, except for motions in limine,
8 must be set for <u>hearing</u> (not filing) by the motion cut-off
9 date specified on the last page of this Order. The Court
10 will deny or strike late-filed motions. Once a party has
11 noticed a motion for hearing on a particular date, the
12 hearing shall not be continued without leave of Court. If
13 the Court concludes that a motion can be resolved without
14 argument, the Court will notify the parties in advance.

15     The parties must adhere to the requirements of the Local
16 Rules. *See* Local Rules 7-1, *et seq.* If any party does not
17 oppose a motion, that party shall submit a written statement
18 that it does not oppose the motion in accordance with Local
19 Rule 7-9. The parties should note that failure to meet the
20 time limits for filing an opposition set forth in Local Rule
21 7-9 shall be deemed consent to the granting of the motion.
22 *See* Local Rule 7-12.

23     The title page of all motions must state the Pre-Trial
24 Conference date and the Trial date. Issues left undetermined
25 after the passage of the motion cut-off date should be listed
26 as issues for trial in the Pre-Trial Conference Order. As an
27 exception to the above, motions in limine dealing with
28 evidentiary matters may be heard pursuant to the schedule

5

**EXHIBIT** C 4      Pg. 157

1  specified on the last page of this Order, however, the Court

2  will not hear or resolve summary judgment motions disguised

3  as motions in limine.

4      Ex parte practice is strongly discouraged.  *See Mission*

5  *Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp. 488

6  (C.D. Cal. 1995).  The Court will require strict adherence to

7  proper ex parte procedures for any ex parte application filed

8  with the Court.  *Id.* at 492; *see also* Local Rule 7-19.

9      (a)  **Applications and Stipulations to Extend Time**

10     No applications or stipulations extending the time to

11  file any required document or to continue any date are

12  effective until and unless the Court approves them.

13  Applications and/or stipulations to extend the time to file

14  any required document or to continue any hearing, Pre-Trial

15  date, or the Trial date must set forth the following:

16          (i)  the existing due date or hearing date, as well

17  as all dates currently set by the Court in this Order,

18  including the discovery cut-off date, the Pre-Trial

19  Conference date, and the Trial date;

20          (ii) the new dates proposed by the parties;

21          (iii) specific, concrete reasons supporting good

22  cause for granting the extension; and

23          (iv) whether there have been prior requests for

24  extensions by any party, and whether those requests were

25  granted or denied by the Court.

26     All applications and stipulations must be accompanied by

27  a separate and independent proposed order which must be

28  submitted to the Court in accordance with General Order 08-

6

**EXHIBIT** C    Pg. 158

1   02.   Failure to submit a separate proposed order may result
2   in the denial of the application or stipulation or the Court
3   may withhold ruling on the application or stipulation until
4   the Court receives a separate proposed order.

5           (b)  **Joinder of Parties and Amendment of Pleadings**

6           The deadline for joining parties and amending pleadings
7   is ninety days after the date of the Scheduling Conference.
8   Any motions to join other parties or for leave to amend the
9   pleadings shall be filed within sixty days of the date of the
10  Scheduling Conference so that they can be heard and decided
11  prior to the deadline.

12          In addition to the requirements of Local Rule 15, all
13  motions to amend the pleadings shall: (1) state the effect of
14  the amendment; (2) be serially numbered to differentiate the
15  amendment from previous amendments; and (3) state the page,
16  line number(s), and wording of any proposed change or
17  addition of material.   The parties shall deliver to Chambers
18  a redlined version of the proposed amended pleading
19  indicating all additions and/or deletions of material.

20          (c)  **Withdrawal or Substitution of Counsel**

21          The Court will not grant a request for approval of
22  substitution of counsel after an action has been set for
23  trial unless: (1) counsel files the request using the most
24  recent version of the appropriate forms provided on the
25  Court's website; and (2) the request is accompanied by a
26  declaration signed by a substituting attorney indicating that
27  such attorney has been advised of the trial date and will be
28  prepared to proceed with trial as scheduled.   Any request for

7

**EXHIBIT** C

Pg. 159

1  substitution of counsel which is not on the proper form or is
2  not accompanied by a declaration signed by a substituting
3  attorney as set forth above will be denied.

4      Counsel who wish to withdraw and substitute their client
5  *pro se* must file a regularly noticed motion to withdraw which
6  demonstrates good cause for the request to withdraw.  The
7  Court will not consider such a motion unless: (1) the motion
8  is accompanied by a declaration signed by the client
9  indicating that the client consents to the withdrawal, has
10 been advised of the time and date of trial, and will be
11 prepared to represent themselves *pro se* on the scheduled
12 trial date; or (2) the court is otherwise satisfied for good
13 cause shown that the attorney should be permitted to
14 withdraw.

15 **4.    SUMMARY JUDGMENT MOTIONS**

16     The Court will only entertain ONE summary judgment motion
17 by a party.  In the event a party believes that more than one
18 summary judgment motion is necessary to expedite the
19 resolution of issues in the action, the party must obtain
20 leave of court to file more than one summary judgment motion.
21 The Court will require strict adherence to the following
22 requirements:

23     (a)  **Statement Of Uncontroverted Facts and Conclusions of**
24          **Law and Statement of Genuine Issues of Material Fact**

25     The Statement of Uncontroverted Facts and Conclusions of
26 Law is to be prepared in a two column format.  The left hand
27 column should set forth the allegedly undisputed fact or
28 conclusion or law.  The right hand column should set forth

8

**EXHIBIT** ᴄ ᵻ

Pg. 160

1   the evidence that supports the factual statement or
2   conclusion of law.  The factual statements and conclusions of
3   law should be set forth in sequentially numbered paragraphs.
4   Each paragraph should contain a narrowly focused statement of
5   fact or conclusion of law.  Each numbered paragraph should
6   address a single subject in as concise a manner as possible.
7        The opposing party's Statement of Genuine Issues of
8   Material Fact must track the movant's Statement of
9   Uncontroverted Facts exactly as prepared.  The document must
10  be in two columns; the left hand column must restate the
11  allegedly undisputed fact, and the right hand column must
12  indicate either undisputed or disputed.  The opposing party
13  may dispute all or only a portion of the statement, but if
14  disputing only a portion, must clearly indicate what part is
15  being disputed.  Where the opposing party is disputing the
16  fact in whole or part, the opposing party must, in the right
17  hand column, label and restate the moving party's evidence in
18  support of the fact, followed by the opposing party's
19  evidence controverting the fact.  Where the opposing party is
20  disputing the fact on the basis of an evidentiary objection,
21  the party must cite to the evidence alleged to be
22  objectionable and state the ground of the objection and
23  nothing more.  **No argument should be set forth in this**
24  **document**.
25       The opposing party may submit additional material facts
26  that bear on or relate to the issues raised by the movant,
27  which shall follow the format described above for the moving
28  party's Separate Statement.  These additional facts shall

9

**EXHIBIT** C

1   follow the movant's facts, shall continue in sequentially

2   numbered paragraphs (*i.e.*, if movant's last statement of fact

3   was set forth in paragraph 30, then the first new fact will

4   be set forth in paragraph 31), and shall set forth in the

5   right hand column the evidence that supports that statement.

6       The moving party, in its reply, shall respond to the

7   additional facts in the same manner and format that the

8   opposing party is required to adhere to in responding to the

9   Statement of Uncontroverted Facts, as described above.

10       **(b)  Supporting Evidence**

11       No party should submit any evidence other than the

12   specific items of evidence or testimony necessary to support

13   or controvert a proposed statement of undisputed fact.  Thus,

14   for example, entire sets of interrogatory responses, or

15   documents that do not specifically support or controvert

16   material in the Statements should not be submitted in support

17   of or in opposition to a motion for summary judgment.  Any

18   such material will not be considered.

19       Evidence submitted in support of or in opposition to a

20   motion for summary judgment should be submitted either by way

21   of stipulation or as exhibits to declarations sufficient to

22   authenticate the proffered evidence, and should not be

23   attached to the memorandum of points and authorities.  The

24   Court will accept counsel's authentication of deposition

25   transcripts, written discovery responses, and the receipt of

26   documents in discovery *if the fact that the document was in*

27   *the opponent's possession is of independent significance*.

28   Documentary evidence as to which there is no stipulation

10

**EXHIBIT C**

1   regarding foundation must be accompanied by the testimony,
2   either by declaration or properly authenticated deposition
3   transcript, of a witness who can establish its authenticity.
4        If a party wishes to offer deposition testimony in
5   support of or in opposition to a motion for summary judgment,
6   that party shall provide the Court with one courtesy copy of
7   the entire transcript of each deposition referenced.  The
8   party shall also prepare and file a separate document for
9   each deponent which contains only those questions and
10   answers, and any objections made at the time of the
11   deposition to those questions, that a party is relying on to
12   support their motion, with a citation to the appropriate page
13   and line number(s) in the deposition transcript.
14        The Court's courtesy copies of all evidence in support of
15   or in opposition to a motion for summary judgment shall be
16   submitted in a separately bound volume and shall include a
17   Table of Contents.  If the supporting evidence exceeds fifty
18   pages, each courtesy copy of the supporting evidence shall be
19   placed in a slant D-ring binder with each item of evidence
20   separated by a tab divider on the right side.  All documents
21   contained in the binder must be three hole punched with the
22   oversized 13/32" hole size, not the standard 9/32" hole size.
23        In addition to the foregoing, the parties shall meet and
24   confer and prepare a binder containing a joint set of all
25   exhibits relied on by the parties in support of and in
26   opposition to the motion for summary judgment.  The parties
27   shall also prepare a table of contents for the exhibit binder
28   which specifically describes each exhibit (i.e. Plaintiff's

11

EXHIBIT C

1   Exhibit 1 - Letter from John Doe to Jane Doe dated January 1,
2   2007 Re: Reasons for Jane Doe's termination). The parties
3   shall not file but shall submit the exhibit binder as a
4   courtesy copy to the Court in conjunction with the filing of
5   the Reply.

6       (c)  **Objections to Evidence**

7       If a party disputes a fact based in whole or in part on
8   an evidentiary objection, the ground for the objection, as
9   indicated above, should be stated in the Separate Statement
10  but not argued in that document. Evidentiary objections are
11  to be addressed in a separate memorandum to be filed with the
12  opposition or reply brief of the party. This memorandum
13  should be organized **to track the paragraph numbers of the**
14  **Separate Statement in sequence**. It should identify the
15  specific item of evidence to which objection is made, or in
16  the case of deposition testimony it should quote the relevant
17  testimony, the ground for the objection, and a very brief
18  argument with citation to authority as to why the objection
19  is well taken. The following is an example of the format
20  contemplated by the Court:

21      Separate Statement Paragraph 1: Objection to the
22      supporting deposition testimony of Jane Smith [quote
23      testimony] at 60:1-10 on the grounds that the statement
24      constitutes inadmissible hearsay and no exception is
25      applicable. To the extent it is offered to prove her
26      state of mind, it is irrelevant since her state of mind
27      is not in issue. Fed. R. Evid. 801, 802.

28

12

**EXHIBIT C**

Pg. 164

1  DO NOT SUBMIT BLANKET OR BOILERPLATE OBJECTIONS TO THE

2  OPPONENT'S STATEMENTS OF UNDISPUTED FACT. THESE WILL BE

3  DISREGARDED AND OVERRULED.

4       (d)  The Memorandum of Points and Authorities

5       The movant's memorandum of points and authorities should

6  be in the usual form required under Local Rule 7 and should

7  contain a narrative statement of facts as to those aspects of

8  the case that are before the Court.  All facts should be

9  supported with citations to the paragraph number in the

10 Separate Statement that supports the factual assertion and

11 not to the underlying evidence.

12      Unless the case involves some unusual twist, the motion

13 need only contain a brief statement of the Fed.R.Civ.P. 56

14 standard; the Court is familiar with the Rule and with its

15 interpretation under *Celotex* and its progeny.  If at all

16 possible, the argument should be organized to focus on the

17 pertinent elements of the claim(s) for relief or defense(s)

18 in issue, with the purpose of showing the existence or non-

19 existence of a genuine issue of material fact for trial on

20 that element of the claim or defense.

21      Likewise, the opposition memorandum of points and

22 authorities should be in the usual form required by Local

23 Rule 7.  Where the opposition memorandum sets forth facts,

24 the memorandum should cite to paragraphs in the Separate

25 Statement if they are not in dispute, to the evidence that

26 contravenes the fact where the fact is in dispute, or, if the

27 fact is contravened by an additional fact in the Statement of

28

**EXHIBIT** C      13

1   Genuine Issues of Material Fact, the citation should be to
2   such fact by paragraph number.

3        (e)  **Proposed Statement of Decision**

4        Each party shall prepare a Proposed Statement of
5   Decision, which shall contain a statement of the relevant
6   facts and applicable law with citations to case law and the
7   record.  The Proposed Statement of Decision shall not exceed
8   five pages and shall be in a form that would be appropriate
9   for the Court to enter as its final order on the motion.  The
10  Proposed Statement of Decision shall be submitted to the
11  Court in accordance with General Order 08-02.

12       (f)  **Timing**

13       Parties need not wait until the motion cut-off date to
14  bring motions for summary judgment or partial summary
15  judgment.  Early completion of non-expert discovery and
16  filing of motions for summary judgment may eliminate or
17  reduce the need for expensive expert depositions which are
18  normally conducted in the last stages of discovery.

19       **Caveat**:  **Failure to respond to a Motion for Summary**
20  **Judgment or Partial Summary Judgment ("Motion") will be**
21  **deemed by the Court as consent to the granting of the Motion.**

22  **5.   MOTIONS IN LIMINE**

23       Before filing any motion in limine, counsel for the
24  parties shall confer in a good faith effort to eliminate the
25  necessity for hearing the motion in limine or to eliminate as
26  many of the disputes as possible.  It shall be the
27  responsibility of counsel for the moving party to arrange for
28  this conference.  The conference shall take place in person

14

**EXHIBIT C**

1  within ten calendar days of service upon opposing counsel of
2  a letter requesting such conference, but in no event later
3  than twenty-one days before the Pre-Trial Conference. Unless
4  counsel agree otherwise, the conference shall take place at
5  the office of the counsel for the moving party. If both
6  counsel are not located in the same county in the Central
7  District, the conference may take place by telephone. The
8  moving party's letter shall identify the testimony, exhibits,
9  or other specific matters alleged to be inadmissible and/or
10 prejudicial, shall state briefly with respect to each such
11 matter the moving party's position (and provide any legal
12 authority which the moving party believes is dispositive),
13 and shall specify the terms of the order to be sought.

14      If counsel are unable to resolve their differences, they
15 shall prepare and file a separate, sequentially numbered
16 Joint Motion in Limine for each issue in dispute which
17 contains a clear caption which identifies the moving party
18 and the nature of the dispute (*i.e.*, "Plaintiff's Motion in
19 limine #1 to exclude the testimony of Defendant's expert").
20 Each Joint Motion in Limine shall consist of one document
21 signed by all counsel. The Joint Motion in Limine shall
22 contain a clear identification of the testimony, exhibits, or
23 other specific matters alleged to be inadmissible and/or
24 prejudicial and a statement of the specific prejudice that
25 will be suffered by the moving party if the motion is not
26 granted. The identification of the matters in dispute shall
27 be followed by each party's contentions and each party's
28 memorandum of points and authorities. The title page of the

15

**EXHIBIT** C

Pg. 167

1   Joint Motion in Limine must state the Pre-Trial Conference
2   date, hearing date for the motions in limine, and Trial date.
3       Joint Motions in Limine made for the purpose of
4   precluding the mention or display of inadmissible and/or
5   prejudicial matter in the presence of the jury shall be
6   accompanied by a declaration that includes the following:
7   (1) a clear identification of the specific matter alleged to
8   be inadmissible and/or prejudicial; (2) a representation to
9   the Court that the subject of the motion in limine has been
10  discussed with opposing counsel, and that opposing counsel
11  has either indicated that such matter will be mentioned or
12  displayed in the presence of the jury before it is admitted
13  in evidence or that counsel has refused to stipulate that
14  such matter will not be mentioned or displayed in the
15  presence of the jury unless and until it is admitted in
16  evidence; and (3) a statement of the specific prejudice that
17  will be suffered by the moving party if the motion in limine
18  is not granted.

19      Unless ordered by the Court, no supplemental or separate
20  memorandum of points and authorities shall be filed by either
21  party in connection with any motion in limine.

22      The Court's courtesy copies of all evidence in support of
23  or in opposition to a motion in limine, including
24  declarations and exhibits to declarations, shall be submitted
25  in a separately bound volume and shall include a Table of
26  Contents.  If the supporting evidence exceeds fifty pages,
27  each courtesy copy of the supporting evidence shall be placed
28  in a slant D-ring binder with each item of evidence separated

16

**EXHIBIT C** ₄      Pg. 168

1 by a tab divider on the right side.  All documents contained
2 in the binder must be three hole punched with the oversized
3 13/32" hole size, not the standard 9/32" hole size.

4     The Court will not consider any motion in limine in the
5 absence of a joint motion or a declaration from counsel for
6 the moving party establishing that opposing counsel: (a)
7 failed to confer in a timely manner; (b) failed to provide
8 the opposing party's portion of the joint motion in a timely
9 manner; or (c) refused to sign and return the joint motion
10 after the opposing party's portion was added.

11     Unless otherwise ordered by the Court, motions in limine
12 should be filed and will be heard on the dates specified on
13 the last page of this Order.  Unless the Court in its
14 discretion otherwise allows, no motions in limine shall be
15 filed or heard on an ex parte basis, absent a showing of
16 irreparable injury or prejudice not attributable to the lack
17 of diligence of the moving party.

18     The failure of any counsel to comply with or cooperate in
19 the foregoing procedures will result in the imposition of
20 sanctions, including a resolution of the issue against the
21 party refusing to cooperate.

22 **6. PRE-TRIAL CONFERENCE AND LOCAL RULE 16 FILINGS**

23     **(a)  General Provisions**

24     The Pre-Trial Conference ("PTC") will be held on the date
25 specified on the last page of this Order, unless the Court
26 expressly waived a PTC at the Scheduling Conference.  If
27 adjustments in the Court's calendar to accommodate congestion
28 become necessary, the Court may re-schedule the PTC instead

**EXHIBIT C**

1  of the trial date.  Therefore, the parties should assume that
2  if the PTC goes forward, the trial will go forward without
3  continuance, although some brief period of trailing may prove
4  necessary.

5       The lead trial attorney on behalf of each party shall
6  attend both the PTC and all meetings of the parties in
7  preparation for the PTC, unless excused for good cause shown
8  in advance of the PTC.

9       A continuance of the PTC at the parties' request or by
10 stipulation is highly unlikely.  **Specifically, failure to**
11 **complete discovery is not a ground for continuance.**  In the
12 unlikely event that the Court agrees to continue the PTC, the
13 trial date is likely to be delayed as a result.  If a change
14 in the trial date is necessitated or likely because of the
15 Court's calendar or otherwise, modifications of that date
16 will be discussed at the PTC.

17      At the PTC, the parties should be prepared to discuss
18 means of streamlining the trial, including, but not limited
19 to:  bifurcation; presentation of foundational and non-
20 critical testimony and direct testimony by deposition
21 excerpts; narrative summaries and/or stipulations as to the
22 content of testimony; presentation of testimony on direct
23 examination by affidavit or by declaration subject to cross-
24 examination; and qualification of experts by admitted
25 resumes.  The Court will also discuss settlement.

26      **(b)    Form of Pre-Trial Conference Order ("PTCO")**

27      The proposed PTCO shall be submitted to the Court in
28 accordance with General Order 08-02 by the date specified on

**EXHIBIT** C .

1  the last page of this Order.  Adherence to this time
2  requirement is necessary for in-chambers preparation of the
3  matter.  The form of the proposed PTCO shall comply with
4  Appendix A to the Local Rules and the following:

5            (i)  Place in "ALL CAPS" and in **bold** the separately
6  numbered headings for each category in the PTCO (*e.g.*, "1.
7  **THE PARTIES**" or "7.   **CLAIMS AND DEFENSES OF THE PARTIES**").

8            (ii) Include a Table of Contents at the beginning.

9            (iii) In specifying the surviving pleadings under
10 Section 1, state which claims or counterclaims have been
11 dismissed or abandoned (*e.g.*, "Plaintiff's second cause of
12 action for breach of fiduciary duty has been dismissed.").
13 Also, in multiple party cases where not all claims or
14 counterclaims will be prosecuted against all remaining
15 parties on the other side, specify to which party each claim
16 or counterclaim is directed.

17            (iv) In drafting the PTCO, the Court expects that
18 the parties will attempt to agree on and set forth as many
19 uncontested facts as possible.  The Court may read the
20 uncontested facts to the jury at the start of the trial. A
21 carefully drafted and comprehensively stated stipulation of
22 facts will reduce the length of trial and increase jury
23 understanding of the case.

24            **(v)  In specifying the parties' claims and defenses**
25 **in Section 7 of the PTCO, each party shall closely follow the**
26 **examples set forth in Appendix A of the Local Rules.**

27

28

19

**EXHIBIT C**   Pg. 171

1    (vi) The Court may submit fact issues to the jury in
2  the form of findings on a special verdict.  The issues of
3  fact should track the elements of a claim or defense on which
4  the jury will be required to make findings.

5    (vii) If expert witnesses are to be called at trial,
6  each party must list and identify its respective expert
7  witnesses, both retained and non-retained.  Failure of a
8  party to list and identify an expert witness in the PTCO
9  shall preclude the party from calling that expert witness at
10 trial.

11    (c)   **Rule 16 Filings; Memoranda; Witness Lists; Exhibit**
12 **Lists**

13    The parties must comply fully with the requirements of
14 Local Rule 16.  They shall file carefully prepared Memoranda
15 of Contentions of Fact and Law (which may also serve as the
16 trial brief), along with their respective Witness Lists and
17 Exhibit Lists, all in accordance with the Local Rules.  See
18 the last page of this Order for applicable dates.

19    (d)  **Summary of Witness Testimony and Time Estimates**
20    Counsel shall prepare a list of their witnesses,
21 including a brief summary (two to three paragraphs) of each
22 witness's expected testimony, an estimate of the length of
23 time needed for direct examination, and whether the witness
24 will testify by deposition or in person.  Counsel shall
25 exchange these lists with opposing counsel.  **Counsel shall**
26 **jointly file a single list of witness testimony summaries,**
27 **including estimates for direct examination of their own**
28 **witnesses and estimates for cross-examination of opposing**

20

**EXHIBIT** C ·         Pg. 172

1 **witnesses.** The joint witness testimony summaries shall be
2 filed at the same time counsel submit the PTCO. If a party
3 intends to offer deposition testimony into evidence at trial,
4 the party shall comply with Local Rule 16-2.7.

5     **(e) Pre-Trial Exhibit Stipulation**

6     The parties shall prepare a Pre-Trial Exhibit Stipulation
7 which shall contain each party's numbered list of all trial
8 exhibits, with objections, if any, to each exhibit including
9 the basis of the objection and the offering party's response.
10 All exhibits to which there is no objection shall be deemed
11 admitted. All parties shall stipulate to the authenticity of
12 exhibits whenever possible, and the Pre-Trial Exhibit
13 Stipulation shall identify any exhibits for which
14 authenticity has not been stipulated to and the specific
15 reasons for the party's failure to stipulate.

16     The Stipulation shall be substantially in the following
17 form:

18                 <u>Pre-Trial Exhibit Stipulation</u>

19 <u>Plaintiff(s)' Exhibits</u>

20 <u>Number</u> <u>Description</u>    <u>If Objection, State Grounds</u>   <u>Response to Objection</u>

21

22 <u>Defendant(s)' Exhibits</u>

23 <u>Number</u> <u>Description</u>    <u>If Objection, State Grounds</u>   <u>Response to Objection</u>

24     The Pre-Trial Exhibit Stipulation shall be filed at the
25 same time counsel submit the PTCO. Failure to comply with
26 this paragraph shall constitute a waiver of all objections.

27

28

**EXHIBIT** U

1  DO NOT SUBMIT BLANKET OR BOILERPLATE OBJECTIONS TO THE
2  OPPOSING PARTY'S EXHIBITS. THESE WILL BE DISREGARDED AND
3  OVERRULED.

4       (f) Jury Instructions, Verdict Forms, Special
5  Interrogatories

6            (i)  Fourteen days before the Local Rule 16-2
7  meeting, the parties shall exchange proposed jury
8  instructions, verdict forms, and special interrogatories.
9  Seven days before the meeting, counsel shall exchange written
10  objections, if any, to proposed jury instructions, verdict
11  forms, and special interrogatories.  At the Local Rule 16-2
12  meeting, the parties shall confer with the objective of
13  submitting one set of agreed upon substantive instructions, a
14  verdict form, and, if necessary, special interrogatories.
15  "Substantive jury instructions" means all instructions
16  relating to the elements of all claims and defenses in the
17  case.  Courtesy copies shall be provided to the Court in
18  accordance with Section 1 of this Order.  **Counsel shall not**
19  **submit proposed preliminary instructions to be given to the**
20  **jury prior to opening statements.  The Court will use its own**
21  **instructions which are patterned after the preliminary**
22  **instructions set forth in the <u>Ninth Circuit Manual of Model</u>**
23  **<u>Jury Instructions</u> (West Publishing, most recent edition).**

24            (ii) If the parties cannot agree upon one complete
25  set of substantive instructions, a verdict form, and/or
26  special interrogatories, they shall file two documents with
27  the Court: a joint document reflecting the agreed upon
28  instructions, verdict form, and/or special interrogatories;

22

**EXHIBIT C**        Pg. 174

1   and a second document in the form of a joint statement
2   regarding the disputed instructions, verdict form, and/or
3   special interrogatories in the following format for each
4   instruction, verdict form, and/or special interrogatories in
5   issue:

6           (a) A separate page containing the text of the
7           disputed language with an identification of the
8           party proposing it;
9           (b) Following the text of the disputed language, the
10          opposing party's statement of objections to the
11          disputed language along with legal authority in
12          support of the argument (not to exceed <u>one</u> page) and
13          proposed alternative language where appropriate; and
14          (c) The proposing party's response to the objection
15          with legal authority supporting the proposed
16          language, not to exceed <u>one</u> page.

17      Both the agreed upon set, and the joint statement re:
18  disputed instructions, verdict form, and/or special
19  interrogatories are to be filed with the Pre-Trial Conference
20  Order and other Local Rule 16 documents.  Courtesy copies
21  shall be provided to the Court in accordance with Section 1
22  of this Order.

23          (iii) All proposed jury instructions shall be in the
24  format specified by Local Rule 51-2.  Additionally, each
25  proposed instruction, whether agreed upon or disputed, shall
26  reference the claim for relief to which it relates and shall
27  also cite to the PTCO.  The Court will send a copy of the
28  instructions into the jury room for the jury's use during

23

**EXHIBIT C**

 1  deliberations.  Accordingly, at the time the documents are
 2  filed, the parties should e-mail a "clean set" of Joint
 3  Proposed and/or Disputed Jury Instructions, containing only
 4  the text of each instruction set forth in full on each page,
 5  with the caption "Court's Instruction No. ___" (eliminating
 6  titles, supporting authority, indication of party proposing,
 7  etc.) to the Chambers' e-mail address:
 8  [JFW_Chambers@cacd.uscourts.gov].
 9          **(iv) A Table of Contents shall be included with all**
10  **jury instructions (both the agreed upon set and the joint**
11  **statement re: disputed instructions) submitted to the Court.**
12  The Table of Contents shall set forth the following:
13          (a)   The number of the instruction;
14          (b)   A brief title of the instruction;
15          (c)   The source of the instruction; and
16          (d)   The page number of the instruction.
17  For example:

| Number | Title | Source | Page Number |
|--------|-------|--------|-------------|
| 1 | Burden of Proof | 9th Cir. Manual of Model Jury Instr. 5.1 | 5 |

22          (v)   The Court directs counsel to use the
23  instructions from the <u>Ninth Circuit Manual of Model Jury</u>
24  <u>Instructions</u> (West Publishing, most recent edition) where
25  applicable.  Where California law is to be applied and the
26  above instructions are not applicable, the Court prefers
27  counsel to use the <u>Judicial Council of California Civil Jury</u>
28  <u>Instructions</u> ("CACI") (LexisNexis Matthew Bender, most recent

**EXHIBIT C**

1  edition).  If neither of these sources is applicable, counsel
2  are directed to use the instructions from O'Malley, Grenig
3  and Lee, <u>Federal Jury Practice and Instructions</u> (most recent
4  edition).

5          (vi) Modifications of instructions from the
6  foregoing sources (or any other form instructions) must
7  specifically state the modification made to the original form
8  instruction and the authority supporting the modification.

9      **Caveat:  The failure of any counsel to comply with or**
10 **cooperate in <u>all</u> of the foregoing procedures regarding jury**
11 **instructions and/or verdict forms will constitute a waiver of**
12 **all objections to the jury instructions and/or verdict form**
13 **used by the Court.**

14         **(g) Real-Time Reporting Requirement**

15     Each party must file with the Court, at the same time
16 counsel submit the PTCO, a document for the Court Reporter
17 which contains proper names, unusual or scientific terms, or
18 any other foreign or uncommon words that are likely to be
19 used by the parties during the PTC and the Trial.  Each party
20 shall also e-mail a copy of the document to the Chambers' e-
21 mail address [JFW_Chambers@cacd.uscourts.gov] at the time of
22 filing.

23     **(h)  Joint Statement of the Case and Requests for Voir**
24 **Dire**

25     At the Pre-Trial Conference, the parties shall file their
26 proposed voir dire questions and their joint statement of the
27 case which the Court shall read to all prospective jurors

28

25

**EXHIBIT C**

Pg. 177

1   prior to the commencement of voir dire.  The statement should
2   be not longer than two or three paragraphs.

3        The Court conducts voir dire of all prospective jurors.
4   The parties need not submit requests for standard voir dire
5   questions, such as education, current occupation, marital
6   status, prior jury service, etc., but should include only
7   proposed questions specifically tailored to the parties and
8   issues of the case.

9   **7.    COURT TRIALS**

10       **(a)  Declarations of Witness Direct Testimony**

11       Counsel in non-jury trials shall submit the direct
12  testimony of their witnesses in writing in a declaration
13  executed under penalty of perjury.  These declarations shall
14  be in admissible form with appropriate foundation established
15  for the declarant's statements.  Paragraphs in each
16  declaration shall be numbered consecutively to facilitate the
17  identification of paragraphs for evidentiary objections.  Any
18  exhibits which are attached to a witness declaration shall be
19  numbered consistent with the number of the exhibit on the
20  Joint Exhibit List.

21       Counsel are to exchange and file these declarations at
22  least eleven calendar days before trial, unless otherwise
23  ordered by the Court.  Courtesy copies shall be provided to
24  the Court in accordance with Section 1 of this Order.
25  Courtesy copies shall be submitted to the Court in a slant D-
26  ring binder with each declaration separated by a tab divider
27  on the right side.  All documents must be three hole punched
28

26

**EXHIBIT** U

1  with the oversized 13/32" hole size, not the standard 9/32"
2  hole size.  The binders shall also contain a table of
3  contents listing the declarations contained therein.
4      Seven calendar days before trial, counsel may file
5  evidentiary objections to those declarations.  Counsel shall
6  prepare a separate document for each declaration for which
7  they have an evidentiary objection in which they shall quote
8  the specific language from the declaration to which they
9  object, followed by the objection and any relevant argument.
10  Counsel shall file any reply or response to the objections by
11  noon on the fourth calendar day before trial.  Courtesy
12  copies shall be provided to the Court in accordance with
13  Section 1 of this Order.  **DO NOT SUBMIT BLANKET OR**
14  **BOILERPLATE OBJECTIONS TO THE OPPOSING PARTY'S WITNESS**
15  **DECLARATIONS. THESE WILL BE DISREGARDED AND OVERRULED.**
16      At trial, the Court will rule on the evidentiary
17  objections and, depending upon the ruling, the declarations
18  will be received in evidence, either in whole or in part, or
19  rejected.  Counsel will then conduct the cross-examination
20  and re-direct examination at trial.
21      Failure to comply with the literal terms of this Order
22  will result in sanctions or the Court may refuse to allow
23  that witness to testify.
24      **(b)  Trial Briefs**
25      Counsel for each party shall file and serve a trial
26  brief, not to exceed 15 pages in length, fourteen calendar
27  days before trial.
28

**EXHIBIT** C            27

1          (c)  **Findings of Fact and Conclusions of Law**
2          Counsel for each party shall file and serve initial
3  proposed findings of fact and conclusions of law fourteen
4  calendar days before trial.  Counsel for each party shall
5  also e-mail a copy of their proposed findings of fact and
6  conclusions of law to the Chambers' e-mail address
7  [JFW_Chambers@cacd.uscourts.gov] on the date due.  Counsel
8  for each party shall then:
9          (1) Underline in red the portions which it disputes;
10         (2) Underline in blue the portions which it admits; and
11         (3) Underline in yellow the portions which it does not
12         dispute, but deems irrelevant.
13         Counsel may agree with a part of a finding or conclusion,
14  disagree with a part of it, and/or consider a part of it
15  irrelevant.
16         Two marked copies of opposing counsel's proposed findings
17  of fact and conclusions of law shall be filed with the Court
18  seven calendar days before trial and one marked copy shall be
19  served on opposing counsel.  Courtesy copies shall be
20  provided to the Court in accordance with Section 1 of this
21  Order.
22  **8.   SETTLEMENT**
23         This Court will not conduct settlement conferences in
24  non-jury cases which the Court will try unless counsel for
25  all parties and their respective clients agree either in
26  writing or on the record.  In jury cases, the Court will
27  conduct a settlement conference at the parties' joint request
28  if three conditions exist:

**EXHIBIT** C   28

1      (a)   The parties are satisfied that the fact issues in
2  the case will be tried to a jury;

3      (b)   All significant pre-trial rulings which the Court
4  must make have been made; and

5      (c)   The parties desire the Court to conduct the
6  conference, understanding that if settlement fails, the Court
7  will preside over trial of the case.

8      The parties must file a Status Report re: Settlement at
9  the time they lodge the Proposed Pre-Trial Conference Order.
10  The Status Report shall include the name and phone number of
11  the Settlement Officer who assisted the parties with their
12  settlement conference.

13      **Caveat:   If counsel fail to file the required Pre-Trial**
14  **documents or fail to appear at the Pre-Trial Conference and**
15  **such failure is not otherwise satisfactorily explained to the**
16  **Court: (a) the cause shall stand dismissed for failure to**
17  **prosecute if such failure occurs on the part of the**
18  **plaintiff; (b) default judgment shall be entered if such**
19  **failure occurs on the part of the defendant; or (c) the Court**
20  **may take such action as it deems appropriate.**

21

22

23  DATED:      October 14, 2008      _____
24                                         JOHN F. WALTER
                                    UNITED STATES DISTRICT JUDGE
25

26

27

28

(Rev. 7/24/08)                     29

**EXHIBIT C**            Pg.181

## JUDGE JOHN F. WALTER
## SCHEDULE OF TRIAL AND PRE-TRIAL DATES

| Matter | Time | Weeks before trial | Plaintiff(s) (Request) | Defendant(s) (Request) | Court Order |
|--------|------|--------------------|------------------------|------------------------|-------------|
| Trial (jury) Estimated length: _5_ days | 8:30 am | | | | 8/25/09 |
| [Jury trial] Hearing on Motions in Limine; Hearing on Disputed Jury Instructions | 10:00 am | | | | 8/14/09 |
| [Court trial] Hearing on Motions in Limine | 10:00 am | | | | N/A |
| Pre-Trial Conference; File Proposed Voir Dire Qs and Agreed-to Statement of Case | 10:00 am | | | | 8/7/09 |
| Submit Pre-Trial Conf. Order; File Motions in Limine; Memo of Contentions of Fact and Law; Pre-Trial Exhibit Stipulation; Summary of Witness Testimony and Time Estimates; File Status Report re: Settlement; File Agreed Upon Set of Jury Instructions and Verdict Forms; File Joint Statement re Disputed Instructions, Verdicts, etc. | | | | | 7/24/09 |
| Last day for hearing motions * | 1:30 pm | | | | 5/4/09 |
| Discovery cut-off | | | | | 4/15/09 |

## ADDITIONAL MATTERS TO BE DETERMINED AT SCHEDULING CONFERENCE

| | | | | | |
|--------|------|--------------------|------------------------|------------------------|-------------|
| Last day to conduct Settlement Conference | | | | | 6/1/09 |
| Last day to file Joint Report re: results of Settlement Conference | | | | | 6/10/09 |

* Motions for class certification shall be filed in accordance with Local Rule 23-3.

(Rev. 7/24/08)                                              30

### EXHIBIT C

# EXHIBIT D

**Shahin Rezvani**

| | |
|---|---|
| **From:** | Steven Ames Brown [sabrown@entertainmentlaw.com] |
| **Sent:** | Tuesday, July 14, 2009 7:00 PM |
| **To:** | David Quinto |
| **Cc:** | Shahin Rezvani |
| **Subject:** | RE: Meet and Confer |

Dear David:

I think it accurate to say that we have met & conferred on this issue either by voice or by exchanged motions to the point of utter exhaustion!

Best,
Steven

**From:** David Quinto [mailto:davidquinto@quinnemanuel.com]
**Sent:** Tuesday, July 14, 2009 6:57 PM
**To:** Steven Ames Brown
**Cc:** Shahin Rezvani
**Subject:** Meet and Confer

Steven:

May I truthfully, and without contradiction, represent to the Court that the parties have met and conferred concerning the motion we're bringing before the Magistrate Judge for leave to substitute experts? If you have any concern, I'd be happy to meet and confer further.

Thanks,

Dave


David W. Quinto
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Direct: (213) 443-3146
Main Phone: (213) 443-3000
Main Fax: (213) 443-3100
E-mail: davidquinto@quinnemanuel.com
Web: www.quinnemanuel.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**EXHIBIT D**

# BROWN DECLARATION

# DECLARATION OF STEVEN AMES BROWN

I, STEVEN AMES BROWN, declare:

1. I am counsel to Plaintiff herein.

2. To facilitate an open and frank discussion at the mediation in this action I agreed that Turner could supply a draft report from its damage expert and that Plaintiff would not use the draft in any deposition or trial.  On April 24, 2009 I received from Turner's counsel a draft expert report.  On April 27, 2009 I received from Turner's counsel the final expert report, signed by ████████████████  No substantive changes were made to the draft report.  The only changes in the original text I could find were grammatical.

3. On May 13, 2009 I examined ████████ at his deposition.  He was lucid, cogent and spoke with authority on the theories which underlay the opinions and conclusions in his joint expert report.  ████████ testimony was entirely consistent with his report. ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████  My inquiries were not prompted because of any concern with his cognitive functions.  There was no point where he seemed confused or cognitively diminished.

4. When I saw ████████ return from the lunch break he seemed ████████ Mr. Quinto explained that he became ████████████████████████████.  We had scheduled a short lunch so that we could conclude the examination early in the day.  It had not occurred to me that Turner's counsel expected him to walk to a restaurant instead of providing him food.  ████████ inability to continue was not surprising considering he was put to exertion. Before we went back on the record I engaged in dialog with ████████ and Mr. Quinto about rescheduling. ████████████████████████████████, but he was in every respect able to participate in the discussion.  His speech never slurred; his thoughts were expressed clearly; he was fully responsive to my questions and suggestions. I disagree with Mr. Quinto's conclusions about ████████ behavior.  The deposition was continued because ████████ had become weakened by exhaustion, but his mind was

-24-

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

1   clear.

2       5. Plaintiff has two expert witnesses. Mr. Sills was engaged to testify as to damages

3   and Mr. Halloran was engaged to testify as to industry custom and practices. Mr. Sills'

4   hourly rate is $465.00 and Mr. Halloran's hourly rate is $500.00. In order to prepare for trial

5   any new expert report delivered by Turner would require each of Plaintiff's experts to review

6   the material and prepare testimony as to their own area of expertise. Based on 30 years of

7   trying cases in the area of motion picture, music and television royalties, I would estimate

8   that each expert would devote 5 hours of billable time to such a task.

9       6. In order to prepare to take a deposition of a new expert I would expect to devote the

10  same number of hours I devoted to preparing for       deposition. I spent five hours

11  studying the report and reviewing materials and eight hours in drafting deposition

12  questions. I do not take depositions from outlines. I write out my questions so that I can

13  edit them until I believe they are tight enough to prevent the witnesses from evading or

14  parsing them. I find this is especially important with experts. That is a time-intensive

15  process for me, but it usually results in a shorter deposition. While the bulk of my practice

16  involves contingent representation, when I am called upon to perform services on an hourly

17  basis, my rate is $500.00. I know my rate to be within the range charged by attorneys with

18  30 years of experience in the entertainment industries.

19      7. I was unable to cancel the transcription of       deposition because Turner

20  ordered a rough draft, and therefore was billed $811.35 in court reporter fees for

21        deposition. I have already paid the bill in full.

22      8. I have had some 31 surgical excisions for basal and squamous cell carcinomas.

23  Some incisions have required as little as 2 sutures and one required 25 surgical staples in

24  my scalp. I routinely managed post-operative discomfort with 2 x 500 mg tablets (total of

25  1,000 mg) of Vicodan. Not once have I suffered any cognitive impairment. I have never

26  had to postpone or discontinue a professional obligation because of any diminution of my

27  mental faculties after having taken Vicodan. Important to note is that the drug wears off

28  quickly, generally about four hours after taking the medication.

-25-

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

1      9. Mr. Quinto has twice deposed Beatrice Welles in my presence. The first deposition

2  was in *Welles v. Academy of Motion Picture Arts and Sciences,* USDC CD CA 03-5314

3  DDP. I was present when Mr. Quinto pressed Ms. Welles about her personal finances.

4  She became visibly distraught and began to sob. The deposition had to be adjourned while

5  Ms. Welles regained her composure. In the current action Ms. Welles testified from a zero-

6  gravity recliner. She told Mr. Quinto that she was unable to sit upright for more than a few

7  minutes at a time, was almost entirely unable to work, is now unmarried, and is of limited

8  means.

9      Pursuant to the laws of the United States, I declare under penalty of perjury the

10  foregoing is true and correct.

11      Dated: July 16, 2009

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07015/3012079.2

TURNER'S NOTICE OF MOTION AND MOTION TO SUBSTITUTE REBUTTAL EXPERT

# EXHIBIT A

# REDACTED
# Pages 187-218